THE JOLIET STEEL COMPANY

*v.*

BENJAMIN SHIELDS.

*Filed at Ottawa June 19, 1893.*

| 146 | 603 |
| 60a | 199 |
| 146 | 603 |
| 64a | 189 |
| 146 | 603 |
| 67a | 99 |
| 146 | 603 |
| f94a | [1]101 |
| 146 | 603 |
| 205 | [3]212 |

1. MASTER AND SERVANT— *liability of master to servant for negligence—presumption.* As between master and servant no presumption of negligence arises, on the part of the master, from the mere fact that the servant has been injured while in his employ.

2. In an action by a servant against his master, to recover for a personal injury received while in the service, it is necessary to aver and prove negligence on the part of the defendant. It is not enough to show an injury from the falling of molds used in a steel converting mill, near the place where the plaintiff was working, but it must appear that the falling of the molds was the result of negligence on the part of the defendant; and the fact that the mold was not laid down, as was usual, but left standing on end near where the plaintiff was required to work, is evidence tending to show negligence.

3. SAME— *fellow-servants—who so considered.* Persons may be fellow-servants although not strictly in the same line of employment. One person may be employed to transact one department of business, and another may be employed by the same master to transact a different and distinct branch of business, but if their usual duties bring them into habitual association, so that they may exercise a mutual influence upon each other promotive of proper caution, such persons may be regarded as fellow-servants.

4. In an action by a servant against his master, to recover for a personal injury received from the negligence of the defendant's servants in a converting mill, where ingots of steel were molded, it appeared that the plaintiff was, at the time, foreman of a gang of men whose duty it was to keep in repair the various railroad tracks belonging to the defendant, and that he had nothing to do with the men employed in the converting mill, where steel was made from iron. The duties of the two sets of men never brought them together, and the plaintiff's injury was the result of negligence of the servants working in the converting mill: *Held,* that they were not fellow-servants with the plaintiff and his men.

5. INSTRUCTIONS— *evidence to support—when no ground of reversal.* Where there is no evidence tending to show a certain fact, the court is not required to give any instructions on that subject; but if one is given which does not contain an accurate statement of the law, if it could not have misled the jury, the error in giving the same is not a ground for reversal.

APPEAL from the Appellate Court for the Second District;— heard in that court on appeal from the Circuit Court of Will county; the Hon. DORRANCE DIBELL, Judge, presiding.

Messrs. GARNSEY & KNOX, for the appellant:

The plaintiff must aver and prove such acts of defendant, amounting to negligence, as will entitle him to recover. *Joliet Steel Co.* v. *Shields,* 134 Ill. 214.

He can not aver one kind or act of negligence and recover on another. *Railway Co.* v. *Beggs,* 85 Ill. 93; *Manufacturing Co.* v. *Ballou,* 71 id. 419; *Blanchard* v. *Railway Co.* 126 id. 416; *Bloomington* v. *Goodrich,* 88 id. 558; *Railroad Co.* v. *Bell,* 112 id. 364; *Railroad Co.* v. *Coble,* 113 id. 119.

The plaintiff must show, by specific evidence, a variation from the customary way of doing the work, that said variation was negligent, and that by reason of such variation he was injured. Negligence can not be inferred. *Allen* v. *Gas Co.* 17 Moak, 420, (1 Exch. Div. 251); *Packing Co.* v. *Hightower,* 92 Ill. 139; *Sack* v. *Dolese,* 137 id. 139.

The case shows that the men in the converter set this mold as they set all others, and no reason is given why it fell. It is not alleged that those ordinary methods were improper. Plaintiff can not rely on a presumption of negligence from the mere fact of an accident happening. 14 Am. Ency. of Law, 879; Cooley on Torts, (2d ed.) sec. 674, p. 798, note 1; Bishop on Non-Contract Law, par. 177, 443; *Railroad Co.* v. *Houck,* 72 Ill. 287; *Railroad Co.* v. *Montgomery,* 15 Bradw. 206; *Sorenson* v. *Menasha Co.* 56 Wis. 338; *Kuhns* v. *Railway Co.* 70 Iowa, 561; *Morrison* v. *Phillips,* 44 Wis. 405; *Railroad Co.* v. *Neal,* 65 Md. 438; *Bond* v. *Smith,* 113 N. Y. 378.

It was plaintiff's business to show why this mold fell.

The plaintiff alleges it was his duty to go into the converter and repair tracks. The risk of injury from a falling mold was incident to his employment, and he can not recover. *Manu-*

*facturing Co.* v. *Ballou,* 71 Ill. 419; *Railroad Co.* v. *Geary,* 110 id. 383; *Abend* v. *Railway Co.* 111 id. 202; *Stafford* v. *Railroad Co.* 114 id. 244; *Abend* v. *Furnace Co.* 107 id. 44.

The plaintiff being the "boss" of the situation, and able to protect himself, should have done so, within the rule as laid down by this court in *Johnson* v. *Rolling Mill Co.* 114 Ill. 64.

The instructions as to who are and who are not fellow-servants should be accurate. *Railway Co.* v. *Moranda,* 108 Ill. 576; *Railway Co.* v. *Klein,* 135 id. 41.

The instruction given by the court on this subject was erroneous, as it took from the consideration of the jury the question of fact as developed in this case, and was in opposition to the facts. It should have submitted the question to the jury. *Railroad Co.* v. *Fitzgerald,* 40 Ill. App. 476; *Railway Co.* v. *Kelly,* 25 id. 1.

Mr. J. W. DOWNEY, and Messrs. HALEY & O'DONNELL, for the appellee.

Mr. JUSTICE CRAIG delivered the opinion of the Court:

This is an appeal from a judgment of the Appellate Court for the Second District, affirming a judgment of the circuit court of Will county, rendered against appellant, in favor of appellee, in an action to recover damages for the loss of a leg while the appellee was engaged in the service of the appellant. The case has been twice tried. The first judgment was reversed on the ground that the declaration was insufficient. (*Joliet Steel Co.* v. *Shields,* 134 Ill. 209.) After the cause was remanded the declaration was amended, and a second trial resulted in a judgment for $5000 for the plaintiff, which was affirmed in the Appellate Court. The opinion of the Appellate Court contains a full statement of the facts, and it will not be necessary to repeat them here.

It was averred in the second count of the declaration: "And for that, whereas, on, to-wit, the tenth day of August,

A. D. 1887, the defendant was possessed of and operating a certain mill, known as a converting mill, at the county aforesaid, in which converting mill molten steel was poured from certain ladles into certain large molds, and said molds were by the servants of defendant placed and deposited in various positions upon the floor of said mill; and on, to-wit, the date aforesaid, plaintiff was in the employ of defendant, and it was, among other things, the duty of plaintiff to repair a certain railroad track within said converting mill, and the plaintiff avers that it was then and there the duty of the defendant to keep all appliances and material near to said railroad track in a secure and safe condition, so that the same should be reasonably safe for employes who, in the discharge of their duties, were engaged in working upon said railroad track; and on, to-wit, the date aforesaid, the plaintiff was, in the discharge of his duty aforesaid, and in the exercise of ordinary care and caution, engaged in repairing said railroad track within said converting mill; and on, to-wit, the date aforesaid, the defendant, by its agents and servants, who were not then and there fellow-servants of the said plaintiff, nor consociated with him, the said plaintiff, in the performance of his duties for the said defendant, carelessly and negligently placed and deposited a certain iron mold filled with steel, and of great weight, to-wit, of the weight of three tons, upon one end, and leaning against certain other molds near to said railroad track, and in an insecure and unsafe position, and suffered and permitted the same to remain in such unsafe and insecure position for, to-wit, the period of three hours, and while the plaintiff was so engaged in repairing said track, said iron mold, by reason of its unsafe and insecure position, slipped and fell upon said railroad track, and upon the right leg and foot of the plaintiff, crushing and breaking the foot, ankle and bones of plaintiff's leg in such a manner that the same had to be amputated below the knee joint, by means of which," etc.

Under this and other counts of the declaration, which were similar, it is first contended that no negligence on the part of the defendant was proven, and hence no recovery could be had. It is said in the argument that the evidence merely discloses the fact that an accident happened,—that the mold fell and plaintiff was injured,—and from this it is argued that no negligence was established. As between master and servant it may be conceded that no presumption of negligence arises, on the part of the master, from the mere fact that the servant has been injured while in his employ. (*Illinois Central Railroad Co.* v. *Houck,* 72 Ill. 287 ; *Kuhns* v. *Railway Co.* 70 Iowa, 561 ; *Baltimore Elevator* v. *Neal,* 65 Md. 438 ; *Sack* v. *Dolese,* 137 Ill. 139 ; *East St. Louis Packing Co.* v. *Hightower,* 92 id. 139.) In an action of this character it is necessary to aver and prove negligence on the part of the defendant, and if the record disclosed the fact that plaintiff merely proved the falling of the mold, and the injury, the judgment could not be sustained. But from a careful examination of the evidence found in the record we do not think the position of counsel is borne out by the facts as detailed by the witnesses.

The Joliet Steel Company, as appears from the evidence, has in its mill yard and buildings constituting its plant, about eighteen miles of railroad tracks. The plaintiff was foreman of a gang of men who had charge of these tracks, and it was his duty to keep the tracks in repair. When tracks running into a building needed repairs it was usual to make such repairs after the men working in the building had quit work, and the repairs in what was known as the "converting mill" had always been made on Sunday, when no one was working in the building. In the converting mill steel was made from cast-iron into ingots. Molds were provided, in which the ingots were cast. The Appellate Court, from the facts in the record, have given a condensed description of the molds and their use, as follows : "These molds were of cast-iron, ranging in height from four to six feet, open at both ends, about

eighteen inches square at the bottom and tapering very slightly to the top, and weighing about a ton each. Each mold was set in the casting pit on a square plate of iron, which was concave on the upper surface, making the ingot, when cast, convex on the bottom. They each held, when full, about a ton of steel. The ladle was calculated to hold about seven tons and to fill a set of the molds at each charge, but it sometimes happened that the last mold would be partially filled, and this was called a 'butt mold.' Adjacent to the pit was a large crane, and after the steel had set in the mold so that it would retain its shape as an ingot, the molds were pulled off from the ingots by means of the crane, and the ingots were left in the casting pit, still at a white heat. The molds were then swung around and placed on a bed made of railroad iron, for the purpose of cooling them off." It also appeared from the evidence, that a railway track of the company ran within two or three feet of this place where the molds were placed. After the mold was removed from the ingot, being square on the bottom, it would stand firmly and was not liable to fall over, but if the mold for any reason could not be withdrawn from the ingot, the bottom of the ingot being rounded, it would not stand like an empty mold. It often occurred that a butt mold could not be withdrawn, and on Saturday, July 9, 1887, when those in charge undertook to remove the molds from the last heat, they found one mold containing a butt, which could not be removed. The empty molds were removed by the use of the crane, and raised out of the pit and placed, standing, on the rail-bed. The mold containing the butt was also hoisted, and left standing with the empty molds. After the men in the mill had quit work and left the mill, the plaintiff came in to repair a rail near where the molds were standing, and he had only removed a few shovels of dirt from the defective rail when the butt mold fell over on the track and crushed his leg.

As respects the empty molds, there was no negligence in placing them as they were placed, because when empty they would stand firmly, and were not liable to fall, and thus endanger any person who might be required to labor near where they were placed. But it was different in regard to the butt molds. James M. Patton, who was working in the mill when the plaintiff was injured, and who was familiar with the method adopted in disposing of the molds, testified: "Molds that would not draw they would take out and put on the bank, and if they could not knock the butts out, they laid them one side then, with the wall crane,—they laid them flat down." The evidence of this witness was corroborated by others. It is therefore apparent that the rule adopted and carried out in the mill in regard to butt molds was to lay them down. On this occasion, however, the custom which had been adopted was not observed, but a butt mold, rounded on the bottom, was left by the men standing on one end, with the empty molds. Within twenty minutes after it was thus left standing it fell over on the plaintiff. Here was evidence from which the jury might properly find that the servants of the defendant in charge of the molds were guilty of negligence which resulted in the injury complained of. Had the prevailing custom in the mill in regard to butt molds been adhered to, it is apparent, from the evidence, that the accident resulting in the injury would not have occurred.

It is also claimed that the court erred in giving instruction number 1 for the plaintiff, and refusing numbers 7 and 9 for the defendant. These instructions relate to the law on the question of fellow-servants. In the first part of the one given, fellow-servants are limited to persons in the same line of employment. We do not regard this as an accurate statement. Persons may be fellow-servants although not strictly in the same line of employment. One person may be employed to transact one department of business, and another may be employed by the same master to transact a different and dis-

tinct branch of business, but if their usual duties bring them into habitual association, so that they may exercise a mutual influence upon each other promotive of proper caution, such persons might be regarded as fellow-servants. *Rolling Mill* v. *Johnson*, 114 Ill. 64.

But if the statement of the law of fellow-servants, found in the instruction, was inaccurate, and if the court also erred in refusing the two instructions of defendant on the same subject, we do not regard the ruling on the instructions sufficient ground to reverse the judgment. The plaintiff, as said before, was foreman of a gang of men whose duty it was to keep in repair the various tracks belonging to the defendant. They had nothing to do with the men who were employed in the converting mill, who were making steel from iron. The duties of the two sets of men never brought them together. In the discharge of their respective duties, so far as appears, they never met. Indeed, their duties were as disconnected as if they were employed by different masters, and performed their labor in shops having no connection whatever with each other. There was therefore no evidence in the record tending to establish the relation of fellow-servant between the plaintiff and the servants of the defendant who had charge of the molds, and the court could not be required to give any instructions on that subject. All that was asked on that subject ought to have been refused, and the one given could not mislead the jury, although it did not contain an accurate statement of the law.

The judgment of the Appellate Court will be affirmed.

*Judgment affirmed.*

Subsequently, upon an application for a rehearing, the following additional opinion was filed:

Per CURIAM: In the petition for a rehearing it is claimed that the servants of the defendant, on the day of the accident, placed the molds in the same position that they had previously done; that the custom of the mill was fully observed

in this particular, and that the court, it its opinion, has misapprehended the evidence on this branch of the case. We will briefly refer to some of the evidence bearing on the question.

Patton testified that he was present when the mold which injured the defendant was placed near the tracks defendant undertook to repair. He testified that when the draw-gang lowered the mold they took the chains off and left it. Then followed the following questions and answers:

Q. "Did this draw-gang do anything to this mold except unhook from it and leave it there?

A. "Not that I saw.

Q. "Did you see anybody around this mold after the chain was loosened from it?

A. "No, sir.

Q. "What was the usual position in which they placed butt molds, or molds that would not draw?

A. "Molds that would not draw they would take out and put on the bank, and if they could not knock the butts out they laid them one side there, with the wall crane.

Q. "In what position did they lay them—as to laying them down or standing them up?

A. "Laid them flat down.

Q. "Have you seen many butt molds, or molds that would not draw, laid out there at the time you worked in the mill?

A. "Yes, sir. I have seen quite a few.

Q. "You may state as to whether they stood them up or laid them down.

A. "I said, if they would not draw they would take and lay them down, and if they stood them up they would let them stand.

Q. "By laying them down you mean by setting them down on end?

A. "Laying them flat down. If they would not stand up they would lay them flat down. If they stood up they would let them stand—stand until they got time to drop them."

The witness also testified as follows:

Q. "Did you notice where the empty molds were placed that evening?

A. "They were placed on the east side.

Q. "How near this railroad track?

A. "Well, about three feet and one-half from it.

Q. "Were they standing up or lying down?

A. "They were standing at the time I seen them.

Q. "What was the usual position in which they placed the empty molds?

A. "They always stood them up.

Q. "Was there any butt mold on that bed that evening?

A. "Well, that was the only butt mold I seen. The last mold that was laid on there was the only butt mold I seen.

Q. "Was this butt mold laid—how near the empty mold?

A. "Laid the butt mold alongside of it.

Q. "Did you see this butt mold placed out there?

A. "Yes, sir. I did.

Q. "Did you see the crane deposit the mold in that place?

A. "Yes, sir.

Q. "What was done with it then?

A. "Well, when the mold was lowered there, they took the chains off it."

Butler testified, that when a butt mold did not stand right, or the gang hands who lowered it had any doubt about its standing, they would pull it down with steel or iron hooks. Then followed the following questions and answers:

Q. "The hooks were drawn by the men?

A. "Yes, sir; drawn by the men.

Q. "How many would pull it by the hooks?

A. "Supposed to be three men in the draw-gang.

Q. "Three men were supposed, as I understand you, to take hold of the hook and pull on this mold, and pull it down on to the floor?

A. "Either one of the three.

Q. "Either one of the three?

A. "Yes, sir.

Q. "If it appeared to be standing all right and not leaning any way, was it the habit to pull on it with this hook at all?

A. "It used to be. I have often seen them do it—pull most any of the molds if they doubted they was not perfectly safe—any mold with a butt in it.

Q. "Would they pull it down if they doubted it?

A. "Yes, they would do it. They would pull it down if it didn't stand up in pretty good shape. They would lay it down."

From the evidence of the first witness above mentioned the jury might reasonably conclude that the practice of the defendant company was, not to leave a butt mold standing, but to lay it down, so that no one might be injured whose business required him to pass near where the mold was placed, and in this case the servants of the defendant lowered the mold, removed the chains and left it standing, disregarding the usual practice. From the testimony of the other witnesses referred to above, it appears, and the jury had the right so to find, that it was the habit of the gang-men who lowered a butt mold, to pull on it with hooks and ascertain if it would stand, and if it would not, then to lay it down. In this instance no such precaution was taken, the mold being lowered, chains removed, and no effort whatever made to determine whether it would stand or fall.

From what has been said it seems plain there was evidence before the jury tending to prove that the servants of the defendant did not handle the molds in the same manner that they had previously done, and hence were guilty of negligence. If the evidence tended to establish negligence, then the court did not err in refusing the instruction requiring the jury to find for the defendant.

The petition for a rehearing will be denied.

*Rehearing denied.*