## THE WORLD'S COLUMBIAN EXPOSITION

*v.*

## WILLIAM J. LEHIGH.

*Opinion filed April 16, 1902—Rehearing denied June 10, 1902.*

1. FELLOW-SERVANTS—*relation does not depend upon acquaintance.* Servants of the same master who are co-operating in the same work at the same time, under such conditions and circumstances that they may exercise an influence over each other promotive of proper caution for their own safety, are fellow-servants, irrespective of their acquaintanceship with each other or the length of time they have worked together.

2. SAME—*when relation of fellow-servants exists.* Where a large number of men employed by the same master through the same foreman and controlled by the same assistant foreman are engaged in painting the interior of a building, each gang of two or three doing the same kind of work and using the same kind of scaffolds, and working together indiscriminately for several weeks, the men composing two gangs working side by side on adjacent scaffolds are fellow-servants, so that the negligence of a member of one gang in unfastening a rope and allowing the scaffold on which the other gang was working to fall, cannot be imputed to the master.

*World's Columbian Exposition* v. *Lehigh,* 94 Ill. App. 433, reversed.

APPEAL from the Appellate Court for the First District;—heard in that court on appeal from the Superior Court of Cook county; the Hon. JOSEPH E. GARY, Judge, presiding.

O. W. DYNES, for appellant.

J. WARREN PEASE, (S. W. POLKEY, of counsel,) for appellee.

Mr. JUSTICE RICKS delivered the opinion of the court:

This is an appeal from a judgment of the Appellate Court for the First District affirming a judgment of the superior court of Cook county for $2000 in favor of appellee, William J. Lehigh, against appellant, in an action on the case for personal injuries alleged to have been occasioned by the negligence of appellant's employee, who, it is averred in the declaration, was not a fellow-

servant of appellee.  At the close of all the evidence appellant moved the court to exclude the evidence offered on behalf of the plaintiff and to instruct the jury to find the defendant not guilty, and offered an instruction to that effect, which the court refused to give.

Two grounds are urged for reversal, the first being the refusal of the court to give the instruction directing a verdict for defendant; and second, the refusal to give an instruction telling the jury that appellee was not entitled to recover upon the second count of his amended declaration.  As to the second ground, it is only necessary to say that that count in the declaration was dismissed on the calling of the cause for trial and no evidence was offered under it, and there was no occasion for giving the instruction.

Under the first contention, the case really depends upon whether appellee and one John Smith Elisius, commonly called and hereinafter referred to as Smith, were fellow-servants.  The facts are not disputed.  Appellant offered no evidence except three photographs of a model exhibited by appellee to the jury and used in the progress of the trial.  All the witnesses agree substantially as to every material fact upon which there is any evidence.  From the record it appears that appellee, a painter and calciminer, was on January 7, 1893, engaged in painting in the Manufacturers' building, on the World's Fair grounds, in the city of Chicago.  This building was about 1700 feet long by 800 feet in width and covered nearly forty acres of ground.  There were at that time and place about one hundred persons employed whose work was similar to that of appellee, all under the same foreman and the same assistant foreman.  A part of this force of painters was engaged where it was necessary for them to use scaffolds or stages, which were suspended from beams by ropes and pulleys, so that they could be lowered to the desired height by the painters using them. They were hung by riggers or sailors, who were familiar

with the handling and tying of ropes. These stages were made by suspending ladders horizontally, with boards or planks upon their upper surface, and were about twenty-five feet in length, supported at each end by ropes and tackle.    There were about thirty of these stages in use in this one building, and they were hung adjacent to each other. Upon each of these stages, when in use, were'sometimes two but usually three men, called a "gang." At the time of the accident there were but two men on the stage where appellee was,—appellee and one Bell. On the next stage south of them there were three men.    Each gang painted a "stretch" or strip of about the same width as the length of the stage upon which they worked. In this way the stretch painted by one gang would meet at the end with the stretch painted by the next gang.    The members of a gang might be changed at any time, but usually the personality remained the same where the members were found to work well together. The gangs, however, were changed from place to place and from one stage to another. When a stage was lowered to the floor the painters would go to another stage which had already been hung by the riggers and begin painting, while the riggers would remove the lowered stage to another place and make it ready for the painters.    The business and employment of appellee was the same as that of the other painters.    Each had his own brush and bucket while at work, but at night they were all put together, and the next morning each man selected one for himself without regard to whether he had used it the day before or not. The appliances were all rigged in the same manner and used interchangeably by the men. Appellee had worked in this same building for about five weeks, prior to which time he had worked in the Mines and Mining building, where he and Bell had also worked together.    A gang, in working, would be arranged, one man at each end of the stage and one in the middle.    The end men steadied themselves by holding to the suspension ropes, and the

middle man was provided with a "life line" or rope sus-
pended from some support directly above him.   At the
time this accident occurred the men were painting the
sloping interior of the roof, and thus it was necessary to
keep moving the stages nearer the side of the building
as the painters descended, in order that they might keep
within reaching distance of the space to be painted.   Each
gang, independently, performed this shifting of their re-
spective stages.   In this work of shifting stages the du-
ties of each gang were confined to their own stage and
the stages shifted independently of each other, and the
men of each gang arranged the work to be done in shift-
ing between themselves.   No particular man was assigned
by the foreman or assistant foreman to any particular
position or duty on the stage.   The day of the accident
the stage on which appellee was working and the stage
next south, on which one Smith was the middle man, ex-
tended north and south in a line with each other.   The
Smith gang, consisting of three men, had worked for sev-
eral weeks together.   At the time in question appellee's
gang consisted of himself and one Bell, their middle man
not being with them on this afternoon.   Smith and ap-
pellee were unacquainted with each other, and they were
unable to say whether they had or had not worked on
adjacent stages before that particular time.   These two
gangs had begun work on their respective stages after
lunch on the day of the accident.   When it became time
for the Smith gang to shift their stage, the two stages
were not even, some witnesses placing appellee's stage
five to twelve feet below Smith's and others placing ap-
pellee's stage slightly above Smith's.   Appellee's stage
was about thirty-five feet from the floor of the gallery.
While appellee and his co-worker, Bell, were engaged in
their painting, Smith went aloft to untie the ropes of the
stage on which he was working, preparatory to shifting
it, but instead of untying the proper rope he untied the
rope attached to appellee's stage, causing it to drop some

distance, which caused appellee to fall to the floor below, causing the injury complained of. It further appears that this work was being done during cold weather, and the large building in which they were working was being heated by salamanders. The men, at the noon hour, ate their lunches in the building, gathering around these sala- manders, of which there appeared to be a number, and warmed their tea, and such other things as they cared to, over them.

The only variance in the testimony of appellee's wit- nesses was as to a single proposition. All agree that at the time the stages or scaffolds were hung, on this par- ticular day, they were in line and of the same height, and the evidence shows that appellee and Bell began work a little sooner than what has been designated the Smith gang. Smith testified that at the time of the injury ap- pellee's stage was about five feet higher than the stage which he was upon, while appellee, and Broderick, the assistant foreman, and Olson, one of Smith's gang, testi- fied that the Smith stage was lower than that of appel- lee; that upon appellee's stage there were but two men working while upon the Smith stage there were three; that the stretches, or amount of work to be done by the men upon each stage, were the same, and that as the Smith stage had three men upon it they worked faster and accomplished the work more quickly than the two men on the stage of appellee, and passed them in their downward course and reached the point for shifting be- fore appellee's stage reached that point. This seemed the more reasonable view and is the evidence of appel- lee himself.

Upon this state of facts the question arises, were ap- pellee and Smith fellow-servants, within the meaning of the law? And this is the only question, for it is not pretended or insisted that Smith was not a thoroughly competent man or that the appellant was guilty in any manner in failing to furnish a safe place to work or

proper material and machinery to work with, so that if Smith was a fellow-servant with appellee then this case should be reversed, otherwise it should be affirmed. They were employed by the same master, through the same foreman, Hunt, and were controlled and operated under the same assistant foreman, Broderick, in the same building where they had been working together or at the same thing at least for five or six weeks, where all the men, about one hundred in number, were doing the same kind of work upon the same kind of scaffolds. No particular man or set of men were identified for any definite length of time with any scaffold or any tool or appliance used by them in the work, except when they were actually doing the work they were strung along the building, divided into gangs of three, for the convenience of doing the work. They were simply, as we look upon them, all one hundred men doing the same thing in the same place at the same time. Appellee's evidence shows that every man engaged at that work was a competent man, especially acquainted with that class of work and especially employed to do that class of work because of his acquaintance with and ability to do it; that the manner of doing the work was such that no man or set of men, except for and when shifting the stages, had any particular or given place to work; that one time a gang would be upon a scaffold having two other gangs, one on each side, doing the same thing and the same class of work as was being done upon the occasion in question, and when the ground was reached with those scaffolds or stages and the stretch completed, such stage and place were left by the gang and another stage and place occupied, so that there was constant change and intermixture of all those men from the time appellee and his gang went in there, which was some five or six weeks before the injury, to the time it occurred. At the particular day and time appellee had gone to the stage in question and gone to work, as the evidence tends to show, immediately

after, or possibly a little before, luncheon time, and Smith and his gang followed soon after; that when appellee went to his stage the Smith stage was hanging on the same plane and end to end with it, and close enough to it that he and the end man on the north end of the Smith stage would be close enough together that each of them would paint a part,—one-half of the sides,—of an eight-inch-square column that formed the dividing line between their two stretches; that there was no obstruction between the stages, but that the men along the entire line, from one stage to the other, could be seen by the occupants of any of the stages; that during the work on this stage the Smith gang, beginning their work later than the gang of appellee but having more men at work, passed appellee in the descent, so that Smith, when he left his stage to go to the beam above to make the shift and loosen the sling, was in full view of Lehigh if he cared to pay any attention to him, and must have passed him in the ascent to the beam above, where the sling was attached. When at the beam, the evidence shows that he was in full view of Lehigh and all the occupants of the stage if they would look in that direction, and the two stages being so close together, as the evidence shows, that the fastenings from the beam above that held the tackle and stages in place were necessarily placed close together, often crossing each other, as in this instance. These matters were in the knowledge of all these men. The riggers or sailors, only, hung the ladders or scaffolds in the first instance, and from that time until the gangs got to the floor or through with their stage each gang took care of and shifted its own ladder or stage. The particular work that all of these men were engaged in was painting or calcimining this building, and in doing it, and as a part of it, they shifted their scaffolds or stages as they passed down the circular ceiling to keep near enough to the surface to apply their colors. Of this shifting appellee says:

Q. "In shifting the scaffolds, as it was necessary to shift them in painting along the under side of the roof, was it the painters that shifted them themselves? They did that sometimes, did they not?

A. "Oh, yes; after the scaffold was put up the first time they shifted it till they came to the ground or until they were through with their portion of the work. They painted the whole interior—the whole ceiling; probably go down on the side wall, too.

Q. "And they would shift along as they needed to shift at the ceiling here?

A. "Yes, sir.

Q. "And as they were doing that work one of them would climb aloft and unfasten the rope, as Smith did at the time of the injury?

A. "Yes, whenever they shifted.

Q. "And fix it so that it could be shifted?

A. "Yes, sir.

Q. "You had done that yourself?

A. "Yes, sir.

Q. "In the way that Smith was doing it at the time of the injury, only you loosened the right rope?

A. "Yes, sir.

Q. "You had done that frequently, had you not?

A. "Yes, sir; and the other end man had frequently done that; but quite often the middle man would go up and we would stay at the stage and shift it on the beams.

Q. "And you had often seen the men on both sides shift their scaffolds?

A. "Oh, I never noticed them; I did not have time to notice them.

Q. "Well, they did it plain in sight of where you were?

A. "Yes, sir.

Q. "There was nothing to prevent you seeing them, except that you were too busy with your business?

A. "No.

Q. "The scaffolds in question,—the one on which you were working and the one on which Smith was working at the time,—were hanging in about the way those scaffolds had usually been slung, were they not?

Mr. Pease (counsel for appellee): "It is conceded that they were."

In *Pagels* v. *Meyer*, 193 Ill. 172, is found a review of the cases upon the question of fellow-servants, and among the latest declarations of this court as to the rule it is there said (p. 178): "It is settled beyond controversy that those, only, are fellow-servants whose duties imply association and co-operation, either habitually or at the time of the injury complained of. When their employment does not require co-operation and does not bring them together into such relation that they can exercise an influence upon each other promotive of proper caution they are not fellow-servants; but if they are brought together by directly co-operating with each other in a particular work at the time of the injury, or are by their usual duties brought into habitual association, they have the opportunity and power to influence each other to the exercise of caution by example and advice and by reporting delinquencies to the employer, and are fellow-servants. The basis of the classification of servants of the same master into those who are fellow-servants and those who are not, as established in this State, is such personal relation and association between them as affords opportunity and power to influence each other to proper caution by counsel, advice and example, or the want of such personal relation and association. Where they are brought together in direct co-operation in the performance of a particular work, as in this case, they have such opportunity and power and are brought within the relation required by the rule. Where their usual duties bring them into habitual association, the association must be sufficiently personal to furnish the same opportunity and power to exercise an influence upon each other promo-

tive of proper caution. This is the rule, in substance, as stated in all the cases in this court."

Such being the rule, and the question presented to us being one of law by the request of the instruction to direct a verdict, we feel constrained to hold, under the circumstances in this case, as shown by the record, that appellee and Smith, to whose negligent act appellee's injury was due, were fellow-servants. Smith testified as follows:

Q. "Prior to the time you untied the sling on the north end of the scaffold, did you make any examination to ascertain where that rope went or whose rope it was?

A. "No, sir.

Q. "If you had made an examination you could have ascertained that it was the sling that supported the end of Lehigh and Bell's scaffold?

A. "Yes, sir."

This testimony, taken together with the admission afterwards expressly made in the record that Smith was a competent workman, shows that the injury of appellee was one of those acts of occasional negligence on the part of a fellow-servant which is within the contemplation of the rule exempting the master from liability in such cases. *Illinois Central Railroad Co.* v. *Cox,* 21 Ill. 20.

It is insisted, however, that this evidence shows that these men were not personally acquainted with each other, and that it was not definitely shown that they had ever co-operated together in the particular work before. We may reply that it is not shown to the contrary either. They all testified that they were unable to say whether they had worked together or not. Smith, Olson and appellee all testified,—and they are three of the survivors that were on the two ladders,—that they did not personally know each other; that there was little effort made by the men to become personally acquainted. Smith testified that he was a Dane, and at that time had been but a short time in this country and did not try to become

acquainted with the men. We do not think, however, that the relation depends upon the accident of acquaintance or the length of time they had worked together. It is sufficient if they were co-operating in the same work at the same time, under such conditions and circumstances as that they could exercise an influence over each other promotive of proper caution for their own safety, irrespective of the time they had been working together. We cannot escape the conviction that the indiscriminate method of doing this work by this whole body of men in the particular and peculiar manner in which it was done constituted them all, during the progress of that work, fellow-servants, and with these ladders hung in the manner in which they were, to be shifted by the men upon their own volition and at such time and in such manner as seemed proper to them, each ladder and crew or gang upon it being so related to each other or the one next to it that a mistake or negligent act, such as happened in this case, or others that can readily be conceived, would almost inevitably result in injury to the person, constituted such condition as was calculated to create an incentive to the exercise of mutual care and caution. There was a necessary dependence on each other's care and vigilance for their mutual safety, and whether, under the rule, this body of one hundred painters should all be held to be fellow-servants, we are nevertheless constrained to hold that the two gangs—the Smith and Lehigh—working upon these adjacent ladders, at the time and in the manner they were when this injury occurred, were fellow-servants.

Such being our view, the judgments of the Appellate Court and the superior court of Cook county are reversed, and the cause is remanded to the superior court of Cook county for further proceeding not inconsistent with the views herein expressed.     *Reversed and remanded.*