The Chicago and Eastern Illinois Railroad Co.

*v.*

Byron H. White, Admr.

*Opinion filed April 20, 1904.*

1. Fellow-servants—*employees may be fellow-servants though working in different departments.* If servants of the same master are directly co-operating in the particular business in hand, or if their usual duties are such as to bring them into habitual association so they may exercise an influence upon each other promotive of caution for mutual safety, they are fellow-servants, although employed in different departments.

2. Same—*when co-operation in particular business is a question of fact.* Whether a brakeman belonging to a road crew, who was injured while getting the train ready to leave the yard where it was made up, was "directly co-operating in the particular business in hand" with the switch crew whose negligence caused the injury is a question of fact, where the duties of the latter as to the particular train ceased when it was made up and they were engaged in general switching when the accident occurred.

3. Same—*relation of fellow-servants does not depend upon acquaintance.* Servants of the same master are fellow-servants the moment the requisite conditions are established, either by co-operation in the particular business in hand or by duties which imply habitual association, without regard to the matter of personal acquaintance between them or length of time they have worked together.

4. Same—*when question of habitual association is one of fact.* The question of habitual association between servants, as contemplated by the fellow-servant rule, is one of fact, where the evidence tending to show such association is of such a character that different minds might draw different conclusions.

5. Master and Servant—*servant assumes ordinary risks of employment.* One who enters the service of another contracts to assume the risk of the negligence of his fellow-servants, and also assumes all the risks and hazards usually incident to the employment.

6. Same—*previous happening of same injury not necessary to assumption of risk.* Whether an injury is included in the risk of the employment depends upon the question whether it is an injury liable to occur in the ordinary prosecution of the business, and it is not necessary that the same injury has happened before.

7. Same—*what risk is not assumed by servant.* A servant does not assume the risk of a negligent manner of doing work by other servants who are not his fellow-servants unless it is customary to do the work in that manner.

8. INSTRUCTIONS—*giving instructions containing unexplained techni-cal expressions is not approved.* Giving an instruction using the term *respondeat superior* to express the liability of a master for the neg-ligence of his servant, without any explanation of what is meant, is not approved, but is not ground for reversal where other instruc-tions present the subject in clearer form.

APPEAL from the Appellate Court for the First Dis-trict;—heard in that court on appeal from the Superior Court of Cook county; the Hon. RUSSELL P. GOODWIN, Judge, presiding.

CALHOUN, LYFORD & SHEEAN, for appellant.

JAMES C. MCSHANE, for appellee.

Mr. JUSTICE CARTWRIGHT delivered the opinion of the court:

This is an appeal from a judgment of the Appellate Court for the First District affirming a judgment of the superior court of Cook county in favor of appellee, and against appellant, in an action on the case prosecuted to recover damages for the death of Samuel C. Woodward, a brakeman in the employ of appellant, who was killed in its railroad yard in Chicago on December 22, 1900.

At the conclusion of the evidence the defendant asked the court to instruct the jury to return a verdict of not guilty. The court refused to give the instruction, and the refusal is assigned as error and is the principal sub-ject of argument by counsel on both sides.

It was proved, and is not denied, that the death of Woodward resulted from the negligence of other servants of the defendant, and it is contended that the negligent servants were fellow-servants with Woodward. The dec-laration consisted of a single count, alleging that Wood-ward was employed by the defendant as a brakeman on a train of cars standing on the side-track of defendant in its railroad yard in Chicago; that the train had been made up and was headed south; that deceased went be-

tween cars to repair an air-brake, and that while there
the defendant carelessly and negligently backed another
train against his train and killed him. There was little
or no controversy as to the facts, and the material facts
proved are as follows: Woodward was head brakeman
on a freight train which made daily trips between Chi-
cago and Brazil, Indiana, leaving Chicago about twelve
o'clock. The crew to which he belonged took the train
out usually three times a week. The railroad yard in
Chicago extended from Thirty-third to Thirty-seventh
street, and consisted of two divisions, known as the "new
yard" and the "old yard." The old yard was on the west,
and contained tracks numbered from 1 to 18. The new
yard was on the east side, and contained tracks num-
bered from 1 to 26, and all the tracks formed a continuous
system, connected by lead tracks and switches and form-
ing one yard. Defendant had two switching crews em-
ployed in this yard,—one at the north end, which broke
up and switched trains arriving in the yard, from the
road, setting the cars on various tracks to go to other
roads or to freight houses, and the other at the south end,
which made up trains to go out on the road. When a
freight train came in from the south it stopped on any
track which was unoccupied, and the engine was detached
and went to the round-house at the north end of the yard,
and it was the duty of the head brakeman to accom-
pany the engine for the purpose of throwing switches.
Trains were generally made up to go out on the road by
the south-end crew, and when ready to go out the engine
was taken from the round-house to the head of the train
which was made up for departure, and it was the duty
of the head brakeman to accompany it. It would take
any track that might be unoccupied, to the head of the
train. In going to and from the round-house the engine
was liable to traverse the whole length of the tracks in
the yards, passing over the same tracks and through the
same switches as the switching crews. In making up

trains the crew at the south end would switch from one track to another, and in breaking up trains the switch crew at the north end used the various switch tracks in the same way. There was no dividing line between the switch crews, and they worked all over the yard, wherever their duties called them. On the day of the accident the train on which Woodward was head brakeman was made up as usual, consisting of about twenty coal cars, with a way car at the north end. The train was standing at the south end of the yard, and the crew to which Woodward belonged took the engine to the south end of the train and coupled to it, and Woodward commenced to examine the air-brakes, starting from the engine, to see if they were in working order. There was a defect or leak in the air hose two or three cars from the engine, and Woodward went between the cars to fix the leak. While he was between the cars the switch crew at the north end kicked thirteen cars from the north end of the yard upon the track without a brakeman on them, and they ran rapidly down the track, striking the rear of Woodward's train with such force as to move it two or three car lengths before it could be stopped and he was run over and killed. He had been employed as brakeman for five or six months on this train, and before that had been a clerk in the office at the yard, and during all the time of his employment the manner in which trains were broken up and switched and made up was the same as at the time of his death. The switch crew in the yard were under the direction and control of the yard-master, and the road crews, while in the yard, were also under his direction, but from the time the train was ready to leave until it returned to the yard they were under the direction and control of the train-master.

Woodward was a servant of the defendant, and his death having been caused by the negligence of other servants of the same master, the request of defendant for the instruction raised the question whether there was

any evidence fairly tending to prove that the relations of the servants were such as to render the defendant liable,—or, in other words, that they were not fellow-servants. If the only conclusion to be drawn from the evidence was that they were fellow-servants, the instruction should have been given, but if different conclusions on that question might be reached from the evidentiary facts before the jury, it was not error to refuse the instruction. One of the things to be considered on that question is whether the servants were employed in the same or different departments of the service. The evidence was that the negligent switch crew and Woodward were not employed in the same department. The switch crews were under the control of the yard-master and performed all their work under his direction, while the road crew, in the general performance of their duties, were under the control of the train-master, and yet, when they were in the yard at Chicago, they were to some extent brought within the same department as the switch crews in handling their engine. Under the rule in this State relating to fellow-servants, which is based so largely upon the doctrine of association in the performance of duties, the separation into different departments is not a conclusive test. In one sense, switching crews at different places remote from each other are in the same department, and yet, if they do not directly co-operate with each other and their usual duties are not such as to bring them into habitual association, they are not fellow-servants; and on the other hand, where there is association between the servants in the performance of their duties, they are fellow-servants although in some sense employed in different departments. In *Joliet Steel Co.* v. *Shields*, 146 Ill. 603, the rule is stated as follows (p. 609): "Persons may be fellow-servants although not strictly in the same line of employment. One person may be employed to transact one department of business and another may be employed by the same master to transact

a different and distinct branch of business, but if their usual duties bring them into habitual association so that they may exercise a mutual influence upon each other promotive of proper caution, such persons might be regarded as fellow-servants.—*North Chicago Rolling Mill Co. v. Johnson*, 114 Ill. 57." If servants are directly co-operating in the particular business in hand they are fellow-servants, although their ordinary duties are in different departments. (*Abend* v. *Terre Haute and Indianapolis Railroad Co.* 111 Ill. 202.) If, therefore, Woodward and the north-end switch crew were at the time of the accident directly co-operating in the particular business of the defendant then in hand, or if their usual duties were of such a nature as to bring them into habitual association so that they might exercise an influence upon each other promotive of proper caution for their mutual safety, then they were fellow-servants, notwithstanding their employment in different departments of the service.

Appellant claims that the particular business in hand when the accident happened was the whole business of the railroad yard, which consisted of receiving trains from the road, breaking them up and distributing cars for freight houses and other roads, making up freight trains and dispatching them on the road, and the moving of cars and trains for all these purposes. It is quite evident that direct co-operation in particular business does not mean the same thing as habitual association in the performance of duties, since, if that were so, there would be no occasion for stating two branches of the rule. Direct co-operation in a particular business is distinguished from indirect co-operation or co-operation in the general business of the master. Different persons employed in this extensive yard in some capacity, or who had occasion to be there in performance of different or separate duties, might be engaged in doing different parts of the same work and promoting the general business of the master and their duties be such as to bring

209—9

them into habitual association, although not directly co-operating in a particular part of the work. The duties of the road crew respecting a train did not begin until the duties of the switch crew making it up ended, and the duties of the crew on the incoming train ceased before those of the switch crew began, and under the rule declared in *Chicago and Alton Railroad Co.* v. *Hoyt*, 122 Ill. 369, they could not be said, as a matter of law, to be directly co-operating in the particular business in hand. That question was properly submitted to the jury as one of fact.

On the question whether the duties of Woodward and the switch crew were such as to bring them into habitual association so as to exercise an influence over each other promotive of proper caution, the evidence was that the road crew, including the head brakeman, would take the engine, when uncoupled, and run over the track to the round-house, and would take it from the round-house and run over the tracks to couple on the out-going train, and in doing so they ran through the yard over the tracks where the switch crews were working. It is contended by appellant that this fact established such habitual association between the two classes of servants as would make them fellow-servants in the law. Counsel for appellee says that they were not fellow-servants because Woodward was not even acquainted with the members of the north-end crew, and therefore the two could not have exercised an influence over each other promotive of proper caution. The fact of personal acquaintance does not determine the relation, but it depends upon the nature of the duties of the different servants and the incidents of the employment. Whenever the requisite conditions are established, either by co-operation in a particular business then in hand or duties which imply habitual association, that moment the relation commences and under the law the servants are fellow-servants. Whether they are fellow-servants does not depend upon the acci-

dent of acquaintance or the length of time the men have worked together. (*World's Columbian Exposition* v. *Lehigh*, 196 Ill. 612.) Any other rule would be vague, indefinite and impracticable. It would be a question how long the servant must be employed before sufficient acquaintance would be established and a sufficient opportunity given for advice, counsel and caution, so that the servant would cease to have a right of action against the employer. The conclusion might depend upon friendship, which would induce friendly counsel and advice, or personal enmity, which would prevent or prohibit it. The fellow-servant rule rests both upon considerations of public policy and upon the rule that when a servant enters the employment he assumes all the ordinary risks of such employment, including the negligence of fellow-servants associated with him, and both reasons for the rule have been recognized by this court. He assumes the risks as to all those whose duties bring them into habitual association with him, or who may be directly co-operating with him in some particular business in hand at the time of an accident. There was evidence tending to prove that the duties of the road crew and switch crews while in the yard brought them into habitual association, but the evidence was not of such a nature that but one conclusion could have been drawn from it, and therefore the question was properly submitted to the jury. Whether the proper conclusion was drawn from the facts was finally settled by the Appellate Court and is not subject to review here.

It is also contended that the instruction should have been given because, even if Woodward was killed by the negligence of a servant who was not his fellow-servant, yet the risk of such a collision and injury as occurred was assumed by him. As already stated, one who enters the service of another contracts to assume the risk of the negligence of fellow-servants, and he also assumes all the risks or hazards usually incident to the employ-

ment. He is chargeable with the ordinary conditions un-
der which the employment is conducted and is presumed
to have notice of dangers and defects which are patent
and obvious, either in the premises where the work is
done or the methods of doing the work. It is also true
that the question whether an accident or injury is inclu-
ded in the risks of the employment is to be determined
from the question whether it is an accident or injury lia-
ble to occur in the ordinary prosecution of the business,
and it is not necessary to the assumption of such risks
that the same accident should have happened before.
A servant, however, does not assume the risk of a neg-
ligent manner of doing the work by other servants who
are not his fellow-servants, unless it is customary to do
the work in that manner. The risk of such an act is not
one of the usual or ordinary hazards of the employment.
In this case the evidence was, that while it was custom-
ary to kick cars upon tracks without any brakeman to
attend them, it was not the custom to kick them on tracks
where there was a standing train, as was done in this
case. The evidence tended to show that an out-going
train was made up on a separate track, and not on one
used for kicking cars upon. We conclude that the court
was right in refusing the instruction.

The next proposition of counsel is, that there was
no proof to sustain an allegation of the declaration that
Woodward was directed to go between the cars, and that
he went in obedience to orders. This point was not made
in the Appellate Court, and will therefore not be con-
sidered.

The last proposition of appellant's argument is, that
the court erred in giving the first instruction at the re-
quest of the plaintiff. The instruction used the term
*respondeat superior* to express the liability of a master for
a negligent act of his servant without any explanation
of what it meant, and also stated a principle of law to
be within the rule when it was, in fact, without the rule

or an exception to it.   The jury may have had no idea of the meaning of the words *respondeat superior*, and the instruction was apparently copied from a judicial opinion written for professional men.   The general language often used in instructions conveys a very indefinite idea of the law of fellow-servants, and the language of opinions as to co-operation, habitual association, and the like, has but little tendency to enlighten a jury upon that question.   The giving of such instructions and the practice of making use of phrases unintelligible to the ordinary juror is disapproved.   There was, however, nothing that could be said to be incorrect in the instruction, and the twelfth instruction given at the request of defendant seems to have been a much clearer statement of the rule, and doubtless gave the jury an understanding of the relations of fellow-servants.

We find no reason for reversing the judgment.   The judgment of the Appellate Court is affirmed.

*Judgment affirmed.*