# CASES

## ARGUED AND DETERMINED

### IN THE

# SUPREME COURT OF ILLINOIS.

LUDWIG A. D. GATHMAN, Appellee, *vs.* THE CITY OF CHICAGO, Appellant.

*Opinion filed October 26, 1908.*

1. PLEADING—*what is not a variance between allegations and proof.* An allegation that plaintiff's injury was caused by the negligence of a certain person employed by the defendant city as a bridge-tender is supported by proof that the injury was caused by the negligence of persons employed by the bridge-tender, with the knowledge and consent of the city, to perform his work.

2. FELLOW-SERVANTS—*when question whether employees of city were fellow-servants is for the jury.* Whether a machinist and a bridge-tender were fellow-servants is a question of fact for the jury, under evidence showing that though both were employed by the city each was in a separate department and under different superior officers, and that the machinist was sent by his superior to take some measurements of the operating machinery, and while engaged in that work was injured by the act of the bridge-tender in raising the bridge.

3. MASTER AND SERVANT—*when risk of an injury is not assumed by virtue of a contract of employment.* A machinist employed by the bridge department of a city does not, by his contract of employment, assume the risk of an injury due to the negligence of a bridge-tender in raising the bridge underneath which the machinist was working, where the bridge was raised without waiting to receive the signal from the machinist, agreed upon before the latter went underneath the bridge.

4. MUNICIPAL CORPORATIONS—*when city is liable for negligence of persons not paid by it.* A city which knowingly permits a regu-

larly appointed bridge-tender to employ other persons to do his work is liable to a person rightfully upon the bridge for an injury caused by the negligence of the persons so employed in performing their duties, although they are paid by the bridge-tender and not by the city.

APPEAL from the Appellate Court for the First District;—heard in that court on appeal from the Circuit Court of Cook county; the Hon. PAUL McWILLIAMS, Judge, presiding.

This was an action on the case commenced by Ludwig A. D. Gathman against the city of Chicago and James O'Connor, in the circuit court of Cook county, to recover damages for a personal injury alleged to have been sustained by him while in the employ of the city of Chicago, through the negligence of the defendants. The plaintiff dismissed the case as to O'Connor, and thereafter there was a trial upon a declaration containing one count, (to which the general issue was filed,) which, in substance, charged that on January 10, 1901, the defendant the city of Chicago owned, controlled and operated a certain bridge, known as the VanBuren street bridge, in said city, and employed the defendant James O'Connor as a bridge-tender thereon, and to have charge of the machinery and attachments of said bridge for the operation thereof and to raise and lower the same; that on said day the plaintiff was also employed by the said defendant the city of Chicago as a machinist, and was by said defendant ordered to make certain measurements and to perform certain work on the said VanBuren street bridge and beneath and about the same; that while he was in the performance of said work and at work beneath the bridge, the said defendants carelessly and negligently set the machinery of said bridge in motion, and that while the plaintiff was exercising reasonable care for his own safety, because of the negligence of the defendants he was caught between two heavy pieces of iron and was greatly and permanently injured.

At the first trial the jury returned a verdict, under the direction of the court, against the plaintiff, upon which the court rendered judgment in favor of the city, which judgment was reversed by the Appellate Court. (127 Ill. App. 150.) Upon the second trial the plaintiff recovered a verdict for the sum of.$5000, upon which judgment was rendered against the city, which judgment has been affirmed by the Appellate Court for the First District, and a further appeal has been prosecuted to this court.

The Appellate Court in its last opinion made the following statement of facts, which we find, from an examination of the record, to be substantially correct:

"Appellee, at the time of his injury, had been in the employ of the city for a number of years in the bridge department, a subordinate department of the department of public works of the city. A Mr. Willman had immediate charge of the bridge department under Patrick White, the superintendent of bridges, and had authority to give directions to appellee. January 10, 1901, Mr. Willman directed the appellee to go to the VanBuren street bridge and take a measurement of the stroke of the arm of the heel-lock when the bridge was stationary, and then the bridge-tender would raise the bridge for him to take another measurement, so as to get the full stroke of the arm. The evidence tends to prove that in order to ascertain the full stroke of the arm it was necessary to take one measurement when the bridge was stationary and another when it was raised. VanBuren street lies east and west and the bridge in question is across the Chicago river on the line of VanBuren street and connects the part of the street east of the river with the part west of it, so that when it is closed it is a part of the street. The bridge is a rolling lift-bridge and is operated by machinery moved by electrical power. The machinery which operates the east part of the bridge is under the street on the east side, and that operating the west part under the street on the west side. The parts of the

bridge each side of the center are operated separately by separate machinery and each part requires a man to operate it, so that the operation of the bridge requires at least two men. There is, a shanty at the south-east corner and another at the north-west corner of the bridge, in which are situated the appliances to turn on and regulate the power which moves the bridge machinery. When either part of the bridge is raised, the end next the approach to the bridge goes up. To take measurements as directed it was necessary for the appellee to go beneath the part of the bridge which lay east of the center when the bridge was closed or stationary. James O'Connor was the bridge-tender at the time of the accident, having been regularly appointed as such by the mayor of the city, with the concurrence of the city council. The actual work of operating the bridge was done by James O'Brien, who operated the part of it east of the center, and by James McDonald, who operated that part of it west of the center. These men were not employed or paid by the city but were hired and paid by James O'Connor, the bridge-tender. Patrick White, superintendent of bridges, testified that he 'had authority, if he saw a man operating a bridge improperly, to discharge him or make him leave that work; that it made no difference who he was, if he was doing something wrong he could discharge him immediately.' Appellee testified that after ' he was directed by Willman, as above stated, he went to the bridge and into the bridge house on the east side and told O'Brien that he was sent there to take a measurement; that he would take one measurement first, and then would signal him (O'Brien) that he had taken that measurement, and for him to lift the bridge and then he would take the other, and when through would signal him to lower the bridge, and O'Brien said 'it was all right.' The appellee further testified that after the conversation above mentioned, and four or five minutes before he went beneath the bridge, he went to the west side of the bridge and

talked with McDonald, and then went back to the east side and repeated to O'Brien what he had said to him before. McDonald, who operated the west side of the bridge, testified that plaintiff came to him about ten o'clock and said he wanted to take some measurements and would want the bridge raised, and witness told him to notify the operator on the other side, and plaintiff said he would do so and give that operator the signal when he was ready, and the arrangement was that plaintiff and his helper, James Burke, were to notify the operator on the east side of the bridge when they were ready to have that side raised, and that four or five minutes after plaintiff went underneath the bridge witness was signaled from the east side to raise the bridge; that it was necessary for witness to raise his part of the bridge five feet to unlock the bridge, so as to allow the east half to be raised. It appears from the evidence that James J. Kennedy, a common laborer, who had been employed occasionally by McDonald and O'Brien to assist them and paid by whichever of them employed him, was on the bridge at the time in question. He testified that he was in the shanty at the east end of the bridge when the plaintiff was on his way below, and that O'Brien, who was shoveling snow at the time, told witness to get ready to make a lift,—to go ahead and make the lift, as plaintiff wanted to make some measurements,—and witness signaled to McDonald, who signaled back that he was ready and rang the bell to clear the bridge and started to raise his end when the west side went up several feet; that witness turned on the current and started to raise the east end, when he heard a voice, 'Stop! for God's sake, stop!' and witness shut off the current. He also testified that before he made the lift he received no signal from below. While plaintiff was underneath the floor of the bridge, with James Burke, his helper, and engaged in making the first measurement of the arm of the heel-lock, the power was turned on, the machinery set in motion and the east half of the bridge

raised without any signal from either him or Burke. The consequence was that appellee was caught and crushed between the moving arm of the heel-lock and an iron column, and was seriously, and, as the evidence tends to prove, permanently injured."

EDWARD J. BRUNDAGE, Corporation Counsel, and JOHN R. CAVERLY, City Attorney, (EDWARD C. FITCH, and CHARLES B. STAFFORD, of counsel,) for appellant.

CHARLES J. TRAINOR, for appellee.

Mr. JUSTICE HAND delivered the opinion of the court:

It is first contended that there was a fatal variance between the declaration and the proof in this: that the declaration charged that O'Connor was the employee of the city responsible for the accident which caused the injury of appellee, while the evidence showed that O'Connor was not present at the time of the accident, but that the actual work in raising the bridge at the time appellee was injured was performed by James O'Brien and James McDonald, who were in the employ of O'Connor and not in the employ of the city. There are two satisfactory answers to this position of the city: First, by the dismissal as to O'Connor he was eliminated from the case, and the declaration thereafter, without amendment, charged the city with the negligent acts which caused the injury to the appellee; and secondly, the proof sustained the averment of the declaration that it was the negligent act of O'Connor which caused the injury. The evidence showed that O'Connor, a saloon-keeper, was regularly appointed by the mayor of the city of Chicago bridge-tender of the VanBuren street bridge; that he did not tend the bridge personally, but employed O'Brien and McDonald to do the work for him, and that James J. Kennedy, under the direction of O'Brien, set the machinery in motion on the occasion when the appellee was injured. The city knew that O'Brien and McDonald were

in the employ of O'Connor and were in actual control of
the bridge. O'Brien and McDonald, therefore, as to the
city, stood in the place of O'Connor, and the negligence of
O'Brien in directing Kennedy to raise the bridge at the
time of the injury was the negligence of O'Connor, and
proof that the negligent order to raise the bridge was given
by O'Brien sustained the averment of the declaration that it
was the negligence of O'Connor which caused the accident.

It is next contended that O'Connor, O'Brien, McDonald
and Kennedy were the fellow-servants of the appellee, and
that appellee cannot recover for the negligence of O'Con-
nor, or persons in his employ, in handling said bridge. The
question whether the servants of a common master are
fellow-servants is usually a question of fact, and never be-
comes a question of law unless the facts proven show such
relation so clearly to exist that all reasonable minds will
readily agree that such is the relation of the servants of
the common master to each other. (*Duffy* v. *Kivilin,* 195
Ill. 630; *Spring Valley Coal Co.* v. *Patting,* 210 id. 342;
*Missouri Malleable Iron Co.* v. *Dillon,* 206 id. 145.) Here
the injured servant was performing service in one depart-
ment of the city government and was sent by his superior
officer to the bridge to make certain measurements, while
the servants of the city causing the injury performed ser-
vice in another department of the city government and
were under the control of other superior officers, and the
servants of the city handling the bridge had nothing to do
with making the measurements which appellee had been di-
rected to make, their duties being to care for and handle
the bridge. The appellee and the servants of the city who
caused the injury were not, therefore, at the time of the
injury co-operating with each other in the particular busi-
ness of making said measurements or of raising said bridge,
but at the time the appellee was injured he was engaged in
one employment,—*i. e.,* in making measurements,—while
the other servants of the city who caused his injury were

engaged in doing an entirely other thing,—*i. e.*, raising the bridge. The appellee and said servants were not, therefore, necessarily co-operating together at the time appellee was injured. Neither did the line of the employment or the usual duties of the appellee and the servants of the city who operated the bridge necessarily bring the appellee and said servants into habitual association so that they might exercise a mutual influence upon each other promotive of the caution which would protect each other from an injury which might result from the negligence of each other. In *Chicago and Alton Railroad Co.* v. *Hoyt*, 122 Ill. 369, on page 374, it was said: "It was said by this court in *North Chicago Rolling Mill Co.* v. *Johnson*, 114 Ill. 57, that the servants of the same master, to be co-employees so as to exempt the master from liability on account of injuries sustained by one resulting from the negligence of the other, shall be directly co-operating with each other in a particular business,—*i. e.*, the same line of employment,—or that their usual duties shall bring them into habitual association, so that they may exercise a mutual influence upon each other promotive of proper caution." We therefore think it clear the court properly submitted the question whether the appellee and the servants of the city who controlled the bridge at the time he was injured were fellow-servants, to the jury as a question of fact.

It is also urged that the appellee assumed the risk of being injured by the negligence of the bridge-tenders in prematurely raising the bridge while he was beneath the bridge making the measurements which he had been sent to the bridge to make. The general rule is, a servant only assumes the ordinary risks of the business in which he is employed. In this case, before going beneath the bridge he had an understanding with the servants of the city in charge of the bridge that they would not raise the bridge until he signaled them so to do, and the injury which he subsequently sustained was caused by reason of the fact

that said servants violated that understanding and raised
the bridge before the appellee had signaled them so to do
and without notice to the appellee that they were about to
raise the bridge. Clearly, the negligence of the servants
of the city in charge of the bridge in raising the bridge
after they had agreed not to raise it until they had been
signaled to raise the same by the appellee was not a risk
which the appellee assumed by virtue of his contract of em-
ployment with the city. In *Illinois Third Vein Coal Co.* v.
*Cioni*, 215 Ill. 583, on page 590, it was said: "When a
servant enters the employment of the master, the ordinary
risks of such employment which he assumes include the
negligence of fellow-servants associated with him, but he
does not assume the risk of the negligence of employees of
the same master who are not fellow-servants with him."
And in *Chicago and Eastern Illinois Railroad Co.* v. *White,*
209 Ill. 124, on page 132, it was said: "A servant, how-
ever, does not assume the risk of a negligent manner of
doing the work by other servants who are not his fellow-
servants, unless it is customary to do the work in that man-
ner. The risk of such an act is not one of the usual or
ordinary hazards of the employment."

It is also urged that the court erred in instructing the
jury that the city was responsible for the negligent acts of
the men in charge of the bridge in raising the same with-
out being signaled so to do by appellee, as it is contended
O'Brien, McDonald and Kennedy were not the servants of
the city. O'Connor was the regularly appointed represen-
tative of the city and in charge of the VanBuren street
bridge, and the city was responsible for his negligent acts
done in the line of his duty. With the knowledge and
consent of the city O'Connor did not personally perform
the duties imposed upon him, but the city permitted such
duties to be performed by persons employed by O'Connor.
When the city permitted O'Connor to employ men to op-
erate the bridge, and the persons employed by him did oper-

236—2

ate the bridge with the knowledge and the consent of the city, we think it clear the city became liable for the negligent acts of such employees to the same extent that it was liable for the negligent acts of O'Connor, and that it cannot escape liability by reason of the fact that the men in active control of the bridge were paid by O'Connor instead of by the city. Suppose the persons employed by O'Connor operated the bridge in a negligent manner and in consequence of such negligence a person crossing the bridge had been injured; it clearly would not have been a defense to an action brought by such person that the persons in charge of and operating the bridge, with the knowledge and consent of the city, were paid by O'Connor instead of by the city. Our conclusion is that the city was responsible for the negligent acts of the persons in charge of said bridge, and that the court did not err in so instructing the jury.

Other instructions given on behalf of the appellee have been criticised. We think, however, the jury were instructed substantially in accordance with the law.

It is finally contended that the city is not liable to the appellee for the injury which he sustained. The bridge forms a part of one of the public streets of the city, and while it is not stationary, like the street of which, when closed, it forms a part, it is as much under the control of the city as the street, and if the servants of the city, in raising or lowering the bridge, injured a person rightfully crossing the bridge or a person upon a boat beneath the bridge, the city would clearly be liable for such injury; and we are unable to see why the city should not be held liable to the appellee, who was lawfully upon the bridge at the time he was injured, for the negligence of the persons who were operating the bridge with the knowledge and consent of the city.

Finding no reversible error in this record the judgment of the Appellate Court will be affirmed.

*Judgment affirmed.*