Illinois Steel Co. v. Ziemkowski.

of opinion by us as to its validity would be mere *obiter dictum*.

The appeal will be dismissed.

*Appeal dismissed.*

## Illinois Steel Company v. Andrew Ziemkowski.

### Gen. No. 12,098.

1. FELLOW-SERVANTS—*who not.* One who at the time of the accident was engaged in the particular business of converting iron into steel, is not the fellow-servant of a co-employee who at such time was engaged in cleaning and caring for certain tools used in such occupation (if such co-employees were not brought into habitual consociation, as they were not in this case), inasmuch as such relationship did not constitute a direct co-operation in a particular business in the same line of employment.

2. INSTRUCTIONS—*how to be construed.* Instructions are to be construed as a series, making one entire charge, and the omissions or inaccuracies of one may be cured by the contents of the others, or some of them.

3. CONTRIBUTORY NEGLIGENCE—*what does not constitute, as a matter of law.* Where one without his own fault is, through the negligence of another, put in such apparent danger as to cause him terror, loss of self-possession and bewilderment, and as a natural result thereof he, in attempting to escape, puts himself in a more dangerous position, he is not, as a matter of law, chargeable with contributory negligence that will prevent him from recovering damages for the injury.

Action on the case for personal injuries. Appeal from the Superior Court of Cook County; the Hon. ARTHUR H. CHETLAIN, Judge, presiding. Heard in this court at the October term, 1904. Affirmed. Opinion filed November 2, 1905.

**Statement by the Court.** This is an action on the case by appellee against appellant, to recover damages for injuries alleged to have occurred by reason of appellant's negligence. The original declaration and certain additional counts were eliminated by rulings of the court, and the case went to the jury on a second additional count filed April 9, 1902, and the first and second additional counts filed December 19, 1902, and the plea of the general issue filed by appellant.

It is averred, in substance, in the second additional count filed April 9, 1902, that the defendant was engaged in the manufacture of various articles of steel, iron and metals, and had in its plant certain ladles or vessels, with appliances attached thereto, and used by it in said manufacture, and operated various appliances filled with molten metal, slag, or other substances, at a dangerously high temperature; that plaintiff was in defendant's employ, engaged in the work assigned to him, at or near said ladles, receptacles or vessels so filled; that it was defendant's duty not to operate said vessels, etc., so filled, without giving plaintiff timely notice or warning of danger then known to defendant and not known to plaintiff; that defendant disregarded said duty, and so carelessly and negligently operated and managed said vessels, filled as aforesaid, that, by said negligent conduct of defendant, and while plaintiff was engaged in defendant's business, and in the exercise of due care, said molten metal was violently forced up, and spattered and spilled in and around the place where plaintiff was working, and to, upon and against the left eye of plaintiff; by means whereof said eye was destroyed and plaintiff's other eye was seriously injured, etc.

In the first additional count, filed December 19, 1902, it is averred, in substance, after stating the defendant's business, that it used a large receptacle called a vessel, in manufacturing and reducing iron and steel, and that in such use such vessel contained a large amount of iron, steel, slag, etc., in a semi-liquid or molten state, at a high temperature, and that, at a certain time in the operation of the same, particles of iron, steel and slag, etc., so heated, were apt to, and in the ordinary course of business would be thrown, and would fly and spatter from said vessel a great distance, to wit: fifty feet, thus endangering the lives and limbs of persons working at or near the same and within, said distance, and that, at another stage in the operation of such vessel, this would not occur; that plaintiff was in defendant's employ, engaged in his work, and exercising due care; that it was defendant's duty to warn plaintiff

when, in the ordinary course of business, that stage of operation of said vessel was to be reached when said heated particles would be thrown, etc.; that the defendant did not so warn the plaintiff, by reason whereof plaintiff was not aware that said stage of operation was reached, and the said heated particles were hurled and flew from said vessel against plaintiff and into his eye, destroying the same, etc.

The second additional count, filed December 19, 1902, contains substantially the same averments as the first filed at said date, and, in addition, the following averments, in substance: That it was defendant's custom to give warning that the stage of operation was about to be reached when said heated particles were about to be thrown, and that a whistle was then blown; that plaintiff knew and relied on said custom for his protection; that it was defendant's duty to so warn plaintiff and to blow said whistle; but defendant, contrary to said custom, did not warn plaintiff, or blow said whistle, by reason whereof said substances were hurled, thrown and struck against plaintiff and into his eye.

At the conclusion of the plaintiff's evidence, and also at the conclusion of all the evidence, defendant moved the court to instruct the jury to find the defendant not guilty, which motions the court overruled.

The jury found the defendant guilty, and assessed the plaintiff's damages at the sum of $7,500, and the court, after overruling motions for a new trial and in arrest of judgment, rendered judgment on the verdict.

The steel mill of appellant is a large brick building 120 feet square, has a flat roof, and is set with the cardinal points of the compass. On the east side of it there are three vessels numbered from north to south, the extreme north vessel being number 1. The vessels are about twenty feet in length and ten feet in diameter. They are egg-shaped. The nose of the vessel is at the small end and the bottom is flat. They are swung on pivots, at such points between their ends that, when turned down from an upright to a horizontal position, they are parallel with the floor. In

that position the nose or small end of the vessel points west and is from twelve to fifteen feet above the floor of the building. There are eighteen tuieres in the bottom of each vessel. A tuiere is made of fire brick and is about five inches in diameter, with ten holes in it about the diameter of a finger, and arranged in the bottom of the vessel so as to cover it pretty uniformly. The tuieres are used to receive a blast of air, as hereinafter mentioned. Immediately east of the vessels, and along the north and south ends of the set of three, from fifteen to twenty feet above the ground floor, is an iron floor, called the vessel floor, on which floor men stand, who put new tuieres in the vessels when necessary. In front of the vessels, and on a level with their noses when they lie horizontally, is a railroad track running north and south the length of the room, over which ladles of molten iron are brought from a place just south of the steel mill, which molten iron is poured from the ladle on the track through a trough, which swings on a pivot fastened to the track, and can be turned so as to point into the nose of a vessel when in a horizontal position. Also spiegel is brought to the vessel to be put into it. The spiegel is an element necessary in the conversion of iron into steel. The vessel floor connects, at its south end, with the railroad track, and forms a continuous way across the track to the superintendent's office on the south side of the room, whence one can pass west down a short flight of stairs, over another platform, to the blower's platform, which is in the southwest corner of the room, and is about twenty feet above the ground and from sixty to seventy feet distant from the vessels. About thirty feet from the west wall of the building is a platform, called the pouring platform, which runs north and south the entire length of the room. It is made of iron plates turned up at the sides and filled with clay, and is about twelve feet long and twelve feet high, and open underneath. Next east of and in front of this platform is a narrow gauge railroad, which runs from a point near the blower's stage to a point near the north end of the room. Molds are brought

Illinois Steel Co. v. Ziemkowski.

along the narrow gauge railroad, into which men on the platform pour melted steel from ladles. The melted steel is brought to the platform from the vessels in large ladles, by means of cranes. There is a door in the middle of the west wall and just north of it is a platform about twelve feet high, where stood a man who operated the machinery by which the molds were moved along the narrow gauge railway, and just south of the middle door is the blower's platform.

It is necessary in the process of converting iron into steel to blow a blast of air into the vessel containing the molten iron, and the blast is on when the vessel is turned down or up, because otherwise the molten metal would run through the tuieres and spoil the plate on the bottom of the vessel and cause great expense. The blast passes through the tuieres and the molten metal, which is in the belly of the vessel when it is in a horizontal position, and produces a desired effect on the carbon and silicon in the mass. The force of the blast is about twenty pounds to the square inch. This blowing is called blowing a heat, the word heat being used, apparently, with reference to the mass in the vessel. From 120 to 125 heats were blown in twelve hours, at the time of the accident. The object was to have twelve heats an hour. The blast was controlled by the blower from the blower's stage. Two vessels, in an upright position, were being blown at the same time, and while they were being blown the third lay in a horizontal position, and when one of the upright vessels was turned down, the blast being complete, the horizontal one was immediately turned up. The turning down of an upright vessel was controlled by the blower, and when the time came for turning it down, it was his duty to sound a steam whistle, which was in the southwest corner of the blower's stage, and where he could reach the cord attached to it from any part of the stage. The blowing of this whistle was a signal and warning to the men around the room that one vessel was about to be turned down and another up, and they all so understood. When a vessel was being turned down or up, what the witnesses

term sparks would be thrown from the vessel from sixty to seventy feet, and sometimes clear across the room, and generally west in a line with the vessels. These so-called sparks were particles of the molten metal in the vessel. At the time of the accident number 1 vessel was turned down and number 2 up, without the steam whistle having been sounded or any warning given, the consequence of which was that appellee was injured.

Other parts of the evidence will be referred to in the opinion.

WILLIAM DUFF HAYNIE and KEMPER K. KNAPP, for appellant.

F. W. JAROS and FRANCIS J. WOOLLEY, for appellee.

MR. PRESIDING JUSTICE ADAMS delivered the opinion of the court.

Appellant's counsel contend that if there was any negligence, it was that of the blower; that the court erred in giving appellee's instruction 16, and that appellee, in voluntarily taking a place in which to do his work, when there was great danger of injury to him, in case the signal of turning the vessels was not given, assumed the risk.

The evidence shows that it was necessary for the safety of the men working in the steel mill that notice should be given to them when a vessel was about to be turned up or down; that the notice which it was customary to give was a blast from a steam whistle controlled by the blower; that the men understood the sounding of the steam whistle was a signal that a vessel was to be turned down or up, or that one was to be turned-down and another up; that it was the duty of the blower to sound the steam whistle at such times, and that he did not sound it at the time in question. That this was not negligence on the part of the blower, appellant's counsel do not, in their argument, contend. What were the duties, respectively, of the blower and appellee? Mr. Howe, the blower, had charge of the Bessemer process of converting iron into hard steel. All

the men, about fifteen in number, actively engaged in that process, were under him. He controlled the blast from his stage, caused the vessels to be turned up or down, gave orders to put scrap in the vessels, when necessary, gave orders, by messenger boy, to the men who controlled the spiegel at the northeast end of the mill, etc. Mr. Howe himself testified: "The mill work, you may say, practically revolved around the blower. Everything that went on there really depended and revolved about me." Appellant's counsel, in their argument, say: "The steel blower, from the blower's stage, controlled the vessels in which the steel was blown, and though he had but two men under his immediate control, he was the one worker upon whose work depended the work of all the other men in the room." This statement is not applicable to appellee, nor do we think it was so intended. The evidence is that he had control of the whole process, and was in a position to give orders to every workman actively engaged in any part of the process.

Appellee commenced working for appellant about fifteen years before he was injured. He worked first in the yard around the steel mill. His first work in the mill, which lasted about a year, was wheeling scrap onto the elevated floor just behind the vessels. Next, for about six months, he swept sparks from around the vessels, which had been emitted from them. Then, for about ten years, he worked turning molten metal from a ladle, which came from the blast furnace, into the vessels. This was necessarily done from the elevated railroad in front of the vessels, and in the manner described in the preceding statement. At the end of the ten years appellee left appellant's employ for about four years and six months, at the end of which time he was again employed by appellant, when, after chipping castings outside the steel mill for about six months, he was put to work cleaning stoppers, which work he continued at for two years and until he was injured. The molten metal was poured from large ladles by men on the pouring platform, into molds, which were pushed by hydraulic power onto the narrow gauge railroad just east of the pour-

ing platform. ' The ladles had holes in their bottoms which were closed by means of stoppers. A stopper is an iron rod six feet or more in length, outside of which is a hollow tile, greater in diameter than the rod, called a sleeve, and the space between this tile and the iron rod is filled with moist clay. The process of putting on the sleeve and filling in the clay is called lining a stopper. The stopper, after being lined, is baked for twenty-four hours to exclude the moisture, and is then ready for use. The men on the platform, by a contrivance unnecessary to be described, pull the stopper out of a ladle to permit the molten metal to run into the mold on the railway below, and when the mould is full they replace the stopper, and repeat these operations till the ladle is empty. The intense heat of the molten metal and the adhesions of metal and slag to the stopper soon destroy its usefulness, and the pouring men then drop it over on the ground on the west side of the pouring platform. There were two gangs of men engaged in pouring into the molds, one gang near the north end and the other near the south end of the pouring platform; so that each morning there were two piles of damaged stoppers lying on the ground west of the platform. The stoppers weighed, when clean, about eighty-five pounds each, and when unclean, with the metal and slag adhering, about 120 to 125 pounds each. Appellee testified that Mr. Moore, superintendent of the mill, took him to the piles of stoppers and told him, "That is your work, and you are supposed to do that," to clean the stoppers and help Mr. ———; that when he started to work at the stoppers he was with Mr. Norman, who was between him and Mr. Moore, and Norman told him when there were any whistles to be prepared to save himself. Norman was the stopper man and lined the stoppers in a little room in the northwest corner of the large room, and appellee worked under him, and when he found any of the stoppers which needed repair, he took them to that little room, and when the iron rods required repair he took them to the blacksmith.

Appellee went to work at the stoppers at six o'clock

each morning, and it took about two hours each day to clean them. During the remainder of the day his services pertained wholly to the stoppers. At the time of the injury, between eight and nine o'clock in the morning, appellee was working at the south pile of stoppers, about ten feet from the pouring platform, and with his back toward number 2 vessel. Appellee testified that at the time he was hurt he was about thirty feet north of the blower's stage. The blower testified that he was forty feet north of his stage. There is no controversy as to what appellee's work was, where he was when injured, or the manner of the injury. Appellant's counsel, in their statement of the case, say that when he was taken from the work of chipping castings outside the mill, he was "put to work with Henry Norman, getting the stoppers ready for the ladles and repairing them." Also, "It was, perhaps, midway between a door in the middle of the west wall and the pouring platform, and right in line with vessel No. 2, that Ziemkowski stood when he was injured." Counsel, in their statement, further say: "Ziemkowski was standing with his back to No. 2 vessel, ready to carry a stopper rod, which he had just chipped, with the help of Mr. Corbal, when No. 1 vessel was turned down, and then No. 2 vessel was turned up. He felt the sparks strike his back and turned and faced the vessel, and looked right into the shower of sparks. One went into his eye." Appellee testified that he was stooping down cleaning the stoppers, and kept hammering with the sledge and chisel, and the first he knew sparks hit him on the neck and head, and he turned, and a spark hit him in the eye and on the nose. There is no controversy as to what were the duties, respectively, of the blower and appellee, nor can there be any, as there is no conflict in the evidence as to the duties of either. The duties of the blower were, as has been shown, to superintend and direct the movements and actions of the men engaged in the Bessemer process of converting iron into steel, and to give notice by sounding a steam whistle when a vessel was about to be turned down

or up, or when one was about to be turned down and another up; while appellee's sole duty related to the stoppers, very simple instruments, used solely for the purpose of stopping holes in the bottom of the ladles, which were to be filled with the molten and liquid steel. Clearly, appellee's work had nothing to do with the manufacture of the steel, because that manufacture was complete when it was put into the ladles. It was then only necessary to pour it into a mold, so that it might cool and harden in the desired form. Neither had he anything to do with the pouring of the molten metal into the molds.

The reasons for what is known as the fellow-servant rule are stated by the court in C. & N. W. Ry. Co. v. Moranda, 93 Ill. 302. The rule is not formulated in precise terms in that case, but the court say: "Where servants of the same master are co-operating with each other in a particular business, at the time of the injury, or are, by their usual duties, brought into habitual consociation, it may be well supposed that they have the power of influencing each other to the exercise of constant caution in the master's work, by their example, advice and encouragement, and by reporting delinquencies to the master, in as great, and in most cases, in a greater degree, than the master himself." Ib. 316.

In C. & E. I. R. R. Co. v. Kneirim, 152 Ill. 458, 466, the rule is thus stated: "The rule in this State is, that where one servant is injured by the negligence of another servant, where they are directly co-operating with each other in a particular business in the same line of employment, or their duties being such as to bring them into habitual association, so that they may exercise a mutual influence upon each other promotive of proper caution, and the master is guilty of no negligence in employing the servant causing the injury, the master is not liable." Citing ten cases.

Appellant's counsel contend that appellee and the blower were fellow-servants within both branches of the rule. To have been fellow-servants within the first branch of the rule, they must have been "*directly* co-operating with each other

Illinois Steel Co. v. Ziemkowski.

in a *particular* business in the same line of employment."
There must be direct co-operation. "Direct co-operation
in a particular business is distinguished from indirect co-
operation, or co-operation in the general business of the
master." C. & E. I. Ry. Co. v. White, 209 Ill. 124, 129.
It is not enough that the servants were both employed in
the general business of the master, one doing one thing and
another another in such general business. If such were
the rule, then no action would lie for any injury in any
case where the servant injured and the servant at fault
were, at the time of the injury, each engaged in the ordi-
nary duties of his service, no matter how widely removed
or distinct were their employments. The co-operation
must be in the particular business being carried on.

In Chicago City Ry. Co. v. Leach, 208 Ill. 198, the appel-
lee, Leach, was a conductor on the appellant's street rail-
way, and while he was between the grip-car of the train
and the next car to it, endeavoring to take up the slack
between them, another train of the company, which had
been following Leach's train, ran into Leach's train and in-
jured him. The court was asked to hold that the employees
on the two trains were fellow-servants under the first
branch of the rule, but declined so to do, saying : "One
branch of the doctrine is, that those are fellow-servants
who are directly co-operating with each other in some
particular work, and it is contended that the particu-
lar work in hand at the time of the accident to plaintiff
was the running of defendant's trains at the place of the
accident, and therefore the employees on the two trains
were fellow-servants. The rule must have a reasonable
and practical interpretation, and if co-operation in particu-
lar work should be construed to mean identical work, the
rule would not apply in any case, since no two servants
would ever be doing the same identical thing at the same
time. A conductor and gripman have separate duties, and
yet they are directly co-operating with each other in the par-
ticular work of running a train. On the other hand, the
particular work in hand does not include the general busi-

ness of the master. The general business of the defendant was the running of trains on its road, and we do not see how the particular business in which plaintiff was engaged could be extended to include other trains which were following him." Ib. 206–207.

To hold that a servant, whose sole duty is to care for certain tools, is, by that circumstance, directly co-operating with other servants, in the particular business of the master, in which such other servants use the tools, would be an unreasonable application of the rule.

All cases in which one servant was permitted to recover for the negligence of another servant, are cases in which both servants had the same master, and were both engaged in the general business of the master. The particular business which was being carried on at the steel mill, at the time appellee was injured, was the conversion of iron into hard steel by the Bessemer process. The blower, Mr. Howe, was superintending and directing that business. Appellee had nothing whatever to do with it. His business and his sole business was to clean the stoppers and do other acts relating to them. Neither had anything to do with the business of the other. In other words, the particular business in which the blower was engaged was the conversion of iron into steel, and the particular business in which appellee was engaged was cleaning the stoppers and looking after them.

The second branch of the rule is, that their duties are "such as to bring them into habitual association, so that they may exercise a mutual influence upon each other promotive of proper caution." The respective duties of appellee and the blower were not such as to bring them into habitual, or even occasional association. The duties of Mr. Howe, the blower, were as heretofore stated, and were performed on the blower's stage, and related solely to the conversion of iron into hard steel by the Bessemer process, in which appellee was not engaged and with which he had nothing to do. His duty was confined to cleaning and caring for the stoppers. He had nothing to do with the

blower, or the blower's duties, nor had the blower anything to do with him or his duties. Mr. Howe testified that he could see appellee at work by stepping to the front of the blower's stage and looking around the corner, but that he had no occasion to pay any attention to what he was doing; that it made no difference to him what appellee did. The evidence wholly fails to show that their duties were such as to bring them into habitual association, or any association whatever. In the Leach case the court say: "If they are not co-operating in some particular work, or if their usual duties are not such as to bring them into habitual association, so that they may have the opportunity and power to influence each other to the exercise of caution, they are not fellow-servants." The association must be such that the servants may exercise a *"mutual* influence upon each other." In C. & A. R'd Co. v. Murphy, 53 Ill. 336, the court said: "When the ordinary duties and occupations of the servants of the common master are such that one is necessarily exposed to hazard by the carelessness of another * * * they must be regarded as fellow-servants, within the meaning of this rule," but this language was disapproved in the Moranda case, the court saying it was too broad and could not be sustained without overruling numerous prior decisions. 93 Ill. 306. We have examined the cases commented and relied on by appellant's counsel, in their argument. The facts in those cases are different from and not analogous to the facts in this case. The salient facts on which depend the question, whether appellee and the blower were fellow-servants, are not controverted, and we hold, as matter of law, that they were not, at the time of the injury, fellow-servants under either branch of the rule.

The court gave to the jury, by appellee's request, the following instruction:

16. "In order to constitute plaintiff and any other servant of defendant, if any, fellow-servants, it is essential that they shall be at the time of the injury directly co-operating with each other in the particular business in hand, or that their usual duties shall bring them into habitual con-

sociation, so that, in either case, they may exercise an influence upon each other promotive of proper caution. *The jury are to determine from the evidence to what extent, and in what manner, if at all, plaintiff and such other servant, if any, co-operated or associated in their work, and to what extent, if at all, they were able to influence each other as to caution.*"

It is objected that the italicized part of the instruction is erroneous. If our conclusion is correct that, as matter of law on the uncontroverted facts, appellee and the blower were not fellow-servants within the rule, then the court might have so instructed the jury, and an erroneous instruction submitting the question to the jury is immaterial. But, if our conclusion is incorrect, and the question was one for the jury to determine, we think that the instruction, even if erroneous, would not warrant a reversal of the judgment. The case is not a close one on the facts; that is, there is no substantial conflict in the evidence as to the material facts. The instructions are to be considered as a series, as one continuous charge, and the court so instructed the jury.

On the part of appellant the court gave to the jury the following instruction:

17. "The jury are instructed that if they believe from the evidence that the plaintiff and the person who turned No. 2 vessel up at the time of the plaintiff's injury were directly co-operating with each other in a particular business in the same line of employment, or that their duties were such as to bring them into habitual association so that they might exercise a mutual influence upon each other promotive of proper caution, and that the person who turned up No. 2 vessel as aforesaid did not exercise ordinary and reasonable care in the operation of said vessel at that time, then the jury are instructed that there can be no recovery by the plaintiff in this suit by reason of such negligence, if any, of said person who operated said vessel No. 2."

Other instructions were given at appellant's request covering every phase of the case, to some of which appellant was, as we think, not entitled on the evidence.

Lastly, counsel object that appellee voluntarily took a place in which to do his work, where there was great dan-

Illinois Steel Co. v. Ziemkowski.

ger of injury to him, if the signal of turning a vessel should not be given, and thereby assumed the risk of injury; also that he was guilty of contributory negligence. Appellee did not choose the place at which to do his work. He was taken, as the evidence shows, to the place where the stoppers were lying by Mr. Moore, the superintendent of the mill, who said to him, "That is your work, and you are supposed to do it." The evidence also is, that Mr. Norman, the stopper liner, was his immediate foreman, and Norman testified that, if appellee could not clean the stoppers alone, he always helped him; and appellee testified that, when he started to work, Mr. Norman was with him, and told him, "if anything was going on, any whistles going on, to be prepared to save himself." The stoppers weighed, before being cleaned, from 120 to 125 pounds. These facts are utterly inconsistent with the statement of counsel that appellee voluntarily chose the place where he worked. But it is claimed that, when the sparks hit him on the back, he turned round and faced them, and that this was contributory negligence. When the sparks fell on appellee's back and neck, he was in danger and had no time for reflection. In such case one naturally acts on sudden impulse. In C. & A. R'd Co. v. Corson, 198 Ill. 98, 102, the court cite, with approval, the following from Thompson on Negligence: "Where one, without his own fault, is, through the negligence of another, put in such apparent danger as to cause him terror, loss of self-possession and bewilderment, and, as a natural result thereof, he, in attempting to escape, puts himself in a more dangerous position, he is not, as a matter of law, chargeable with contributory negligence that will prevent him from recovering damages for the injury."

The question whether the appellee was guilty of contributory negligence was submitted to the jury by appellant's eleventh instruction, and the jury (properly, as we think,) found that he was not.

It is not assigned as error, or contended in argument, that the sum awarded as damages is excessive.

The judgment will be affirmed.

*Affirmed.*