WILLIAM RITTER

*v.*

THE PEOPLE OF THE STATE OF ILLINOIS.

*Filed at Springfield October 31, 1889.*

1. CRIMINAL LAW—*self-defense.* To justify the taking of human life in self-defense, it must appear that the person killed was the assailant, or that the slayer had in good faith endeavored to decline any further struggle before the mortal blow or wound was given. When the person killed is the assailant, and, after separation, renews or attempts to renew the conflict under such circumstances as to justify a reasonable apprehension in the mind of the slayer that he is in danger of losing his life or of receiving great bodily harm, and he inflicts a mortal wound upon his assailant under such apprehension, he will be justified.

2. SAME—*instruction—in regard to self-defense.* On the trial of one for manslaughter, in which the accused attempts to justify under the plea of self-defense, which the evidence tended to sustain, it is important to the defendant that the jury should be fairly instructed as to the law applicable to his theory of the case, and especially that they shall be left free to determine the fact as to whether his conduct was as he claims, or as contended by the prosecution.

3. EVIDENCE—*testimony on another occasion—as affecting credibility of witness.* On the trial of a party for manslaughter, witnesses for the defense, on cross-examination, testified as to what they had sworn to before the coroner. The defendant asked the court to instruct the jury, "that what any witness or witnesses may have testified to before the grand jury or at the coroner's inquest is no evidence of the guilt of the defendant,"—which the court refused: *Held,* that the refusal was error, as the answers of the witnesses could only be considered by the jury, in weighing their testimony, as to the facts sworn to before them, and not as establishing independent facts testified to on a former occasion.

WRIT OF ERROR to the Circuit Court of McLean county; the Hon. OWEN T. REEVES, Judge, presiding.

Messrs. KERRICK, LUCAS & SPENCER, for the plaintiff in error.

Mr. GEORGE HUNT, Attorney General, Mr. E. H. MINER, State's Attorney, and Mr. E. O'CONNELL, for the People.

Mr. Justice Wilkin delivered the opinion of the Court:

At the November term, 1885, of the circuit court of McLean county, plaintiff in error was convicted of the crime of manslaughter, for killing one Jeff Adkins, and sentenced to the penitentiary for a term of five years. From that judgment he prosecutes this writ of error.

Without going into a general review of the evidence, the following facts are accepted as being established upon the trial: The defendant was a farmer, residing on a farm in McLean county at the time of the killing. Deceased had been employed by him as a farm hand for one month, his time expiring about noon on the 3d of August, 1888. On a settlement that day, a dispute arose between the parties as to whether or not ten dollars of the wages due Adkins should be paid to a neighbor of defendant, to whom Adkins owed that amount. Angry words ensued, and finally Adkins assaulted defendant, striking him several violent blows in the face, defendant making no resistance. Bystanders interposed, and with difficulty took Adkins off of defendant. Just before he struck defendant, Adkins displayed a knife, but did not attempt to use it, and, when defendant called attention to it, put it in his pocket, saying, he could whip him without it. Immediately after they were separated, defendant ordered Adkins to leave the place; but this he refused to do, saying, he would not go until he had whipped him, or "given him a good licking." Defendant then went to his house, a distance of some fifty feet, and got a breech-loading shot-gun. While in the house he was heard to say, with an oath, "Let me go." His wife called out about the same time, telling Adkins to leave the place,—that her husband had a gun. During the time defendant was in the house, Adkins got two brick-bats, each about the size of a half brick. As defendant came out with the gun, he ordered Adkins several times to leave his place, at the same time advancing towards him. Adkins replied once, or perhaps oftener,

"Damn you, you have got your gun,—I am not afraid of it."
A Mr. Freed, who was present, is entirely disinterested and
in no manner discredited, testifies as follows: "Then Ritter
said the third time, 'Now, Adkins, I want you to go off of my
place as quick as you can.' Adkins said, 'I won't do it; you
have your gun, but you dasn't use it.' Then Ritter came to
a full stop, and Adkins advanced toward him two or three
steps." To the question, "I will ask you, if, as he advanced
with a brick, he assumed a striking position, ready to throw?"
he answered, "Yes, sir," and he described the attitude of Ad-
kins as one in the act of throwing, and said, "then Ritter shot;
the shot struck him in the left side." As nearly as can be
ascertained from the evidence, the parties were some ten or
twelve feet apart when the shot was fired.

Adkins died the same day from the effects of the wound.
He was a man of great physical strength, and his reputation
was shown to be that of a quarrelsome, violent man, and so
known to the defendant. He had previously threatened to
whip the defendant if he did not settle satisfactorily with him,
and on the day of the shooting he told another farm hand on
the place, if he (Ritter) did not settle right he would give him
a good whipping. This was communicated to the defendant
shortly before the attempted settlement.

The People introduced evidence tending to show, that when
defendant went to the house for the gun he made the remark
"that he would make it hot for him;" and one witness testi-
fied, that after the shooting he said, alluding to the deceased,
"Let him die, the damned Kentucky son of a bitch." This
last remark was denied by the defendant. In the view we
take of the case it is not important to determine whether such
language was used or not.

In the controversy which led to the first act of violence the
defendant was not blameless, but he did nothing to justify
the assault made upon him by the deceased. The defendant
testified, in his own behalf, that he had not used the gun for

two months previous to that day, and did not know whether it was loaded or not, and that he had, at the time, no intention of shooting the deceased. He also testified: "I thought at the sight of the gun he would go away." It does not appear that he said anything about shooting, or that he presented the gun previous to firing the shot. He swears that at the time the shot was fired the deceased was in the act of throwing, and that the shot was fired without any deliberation, and in self-defense. On the other hand, it is ably argued by counsel for the People, that from the position which the parties are shown to have been in when the gun was fired, and the manner in which the shot took effect on the face of the deceased, he could not have been in the act of throwing at the defendant when he received the fatal wound, and that from all the facts and circumstances proved, it was shown that the shooting was prompted by a spirit of revenge, because of the former attack made by the deceased, and not in self-defense.

Under the plea of self-defense, and the foregoing state of the evidence, it became a matter of first importance to the defendant that the jury should be fairly instructed as to the law applicable to his theory of the case, and especially that they should be left free to determine the fact as to whether his conduct was as he claimed it to be, or as contended by the prosecution.

The fifth instruction given on behalf of the People is quoted from the statute, as follows:

"If a person kill another in self-defense, it must appear that the danger was so urgent and pressing, that in order to save his own life or prevent his receiving great bodily harm, the killing of the other was absolutely necessary; and it must appear, also, that the person killed was the assailant, *or that the slayer had really and in good faith endeavored to decline any further struggle before the mortal blow was given.*"

The sixteenth of the same series of instructions must be understood as applying the law, as stated in this fifth instruction, to the case on trial. It is in the following language:

"The court instructs the jury, that if they believe, from the evidence, the defendant did not renew the fight, but in good faith sought to decline any further struggle, yet if they believe, from the evidence, beyond a reasonable doubt, that the defendant had no reason to believe that Adkins intended to take his life or inflict on him great bodily harm, or have anything more than a fair fight, and that he fired the fatal shot in revenge or in a reckless spirit, then the defendant is not entitled to claim exemption from punishment on the ground that the killing was in self-defense. *It must appear that the defendant not only really and in good faith endeavored to decline any further struggle, or to escape from his assailant, before the fatal shot was fired, but it must also appear that the circumstances were sufficient to excite the fear of a reasonable person,* and that the defendant really acted under the influence of those fears, and not in a spirit of revenge, to entitle the defendant to an acquittal on the ground of justifiable homicide."

This instruction puts the prisoner in the attitude of an assailant, making it incumbent upon him to show, that under the law, as laid down in the fifth instruction, above quoted, he had really and in good faith endeavored to decline any further struggle before the fatal shot was fired. It assumes that his conduct, prior to the shooting, had been such as to make it his duty to so endeavor to decline further struggle, before he could invoke the right of self-defense. The first part of the instruction is fairly susceptible of no other construction. Its language, "if they believe, from the evidence, the defendant did not renew the fight, but in good faith sought to decline any further struggle," is but another mode of telling the jury, that, being the assailant, he could not, under the fifth instruction, exercise the right of self-defense, unless it appeared that he had declined further struggle. But the last clause (which is, in effect, an independent instruction,) still more directly and positively tells the jury that the defendant was the assailant. Although he may have had reasonable

ground to believe, and did honestly believe, that he was in imminent peril of life or limb when he fired the fatal shot, and did so in his necessary self-defense, and not in any spirit of revenge, still, under this instruction, unless it also appeared that he had really and in good faith endeavored to decline any further struggle, he would not be justifiable. The theory of the defense was, that he was not the assailant; that the deceased, having assaulted and struck him, refused to leave his premises until he had further beaten him; that in the exercise of a right to compel him to leave, but with no intention of shooting him, defendant took the gun, hoping thereby to frighten him away; that before he in any way attempted to use the gun as a weapon, Adkins again assailed him, and was in the act of hurling a dangerous missile at him when the shot was fired. There was certainly evidence tending to support that theory. The jury was not bound to accept it, but if they did, the right of self-defense in no way depended upon the question as to whether or not he had declined further struggle. The sixteenth instruction is, in our opinion, manifestly erroneous, and in effect took from the defendant the right of self-defense, under his theory of the evidence.

Numerous instructions were given on behalf of the People, many of which are criticized by counsel for plaintiff in error, but we have discovered no substantial error in them, except as stated. Several of those asked by the defendant were refused, among others the following:

"The court instructs you, that what any witness or witnesses may have testified to before the grand jury or at the coroner's inquest is no evidence of the guilt of the defendant."

In view of the evidence of the uncle of the defendant, and of Mrs. Roberts, on their cross-examination as to what they had sworn to before the coroner, this instruction should have been given. The cross-examination was proper, but the answers could only be considered by the jury, in weighing the testimony of the witnesses, as to the facts sworn to before

them, and not as establishing independent facts testified to on a different occasion.

For the errors indicated, the judgment of the circuit court will be reversed.                    *Judgment reversed.*

SHOPE, C.'J.:    I do not concur in the reasoning or conclusion reached by the opinion in this case.

MAGRUDER, J.:    I do not concur.