## Marie Faulkner, Administratrix of the Estate of Clyde M. Faulkner, Deceased, Appellee, v. New York Central Railroad Company, Appellant.

### Gen. No. 28,408.

1. MASTER AND SERVANT—*risks assumed by switchman as jury question.* In an action against a railroad under the Federal Employers' Liability Act for damages for the death of a switchman by the negligent operation of his master's locomotive, the question whether or not the failure of the employer to keep a lookout on a backing engine, or to ring the bell or sound the whistle or reduce the speed of the engine, were ordinary risks which the switchman assumed, is one of fact for the jury on conflicting evidence.

2. MASTER AND SERVANT—*fellow-servant doctrine no defense under Federal Employers' Liability Act.* The fellow-servant doctrine is not available as a defense under the Federal Employers' Liability Act.

3. MASTER AND SERVANT—*sufficiency of evidence of negligence.* In an action under the Federal Employers' Liability Act for damages for the death of a switchman killed by a backing switch engine, evidence tending to show that the switchman could have been seen by the enginemen if they had looked for him, the track being clear and the day bright, that the engine could have been stopped if it had been under control as claimed, that the bell was not rung or timely signal given, and that the engine was being operated at a greater speed than was customary or safe for switching operations, is sufficient to warrant the jury in finding that defendant was negligent.

4. MASTER AND SERVANT—*evidence as to ordinary risk assumed as incident of employment.* Evidence which shows that decedent, a switchman, who was killed by a backing engine on a track adjacent to that on which he was employed, as he alighted from a slowly moving switch train, and tends to show that no proper lookout was kept on the backing engine although the enginemen had notice that a switchman would be in the place in question, that no bell was rung or timely signal given by the backing engine and that it was running at a high and unsafe speed for switching operations, is sufficient to warrant the jury in finding that such negligence was not one of the ordinary risks assumed by decedent as an incident of his employment and that such negligence was not habitual or customary negligence obviously or fully known to decedent and appreciated by him.

5. MASTER AND SERVANT—*contributory negligence of switchman as jury question.* In an action under the Federal Employers' Liability Act for damages for the death of a switchman who was killed by a backing switch engine on a track adjoining that on which his duties compelled him to work, his contributory negligence is not shown as a matter of law to have been the sole proximate cause of his death where the evidence as to his negligence is disputed and there is evidence showing negligence by defendant.

Appeal by defendant from the Superior Court of Cook county; the Hon. HUGO PAM, Judge, presiding. Heard in the first division of this court for the first district at the March term, 1923. Affirmed. Opinion filed March 10, 1924.

GLENNON, CARY, WALKER & MURRAY, for appellant; MARVIN A. JERSILD, of counsel.

JAMES C. McSHANE, for appellee.

MR. JUSTICE JOHNSTON delivered the opinion of the court.

This is an appeal by the defendant, The New York Central Railroad Company, from a judgment in the sum of $7,500 in an action under the Federal Employers' Liability Act, brought by plaintiff, as administratrix, for the death of her husband, Clyde M. Faulkner, alleged to have been caused by the negligence of the defendant.

The negligence charged against the defendant is that the engineer of the defendant negligently operated one of its passenger engines and thereby caused Faulkner's death. Faulkner was a switchman employed by the defendant and had been working for the defendant about eight months. He had worked as a switchman for other railroads for about eleven years altogether. He was killed at 53rd street in the City of Chicago on February 1, 1921. On that day he was working in connection with a switch engine of the defendant. Fifty-third street is an east and west street. Running north from 53rd street are six parallel main tracks of the defendant and another railroad, which

are numbered, beginning with the east track, 1, 2, 3, 4, 5 and 6; track No. 1 was used for northbound freight of the defendant, track No. 2 for southbound freight of the defendant, track No. 3 for northbound passenger trains of the defendant, track No. 4 for southbound passenger trains of the defendant and tracks Nos. 5 and 6 were used by the other railroad. Faulkner was on track No. 2 when he was killed. He had crossed to that track from track No. 1 after alighting from the switch engine which was backing south on track No. 1, pulling some empty freight cars. The distance between track No. 1 and track No. 2 was 8 feet. Before Faulkner alighted he had been on the west side of the footboard of the switch engine. On the south end of the first car within "touching distance" of Faulkner there was another switchman named Ross. About 30 feet north of the place where Faulkner got off the switch engine, Ross had alighted to throw a switch on the east side of track No. 1 to allow the switch engine with the cars to go north on tract No. 1. The switch was north of the viaduct at 53rd street and east of track No. 1. A passenger engine was being backed south on track No. 2. This engine struck Faulkner and killed him. At the time of the accident there were ten cars loaded with coal standing on track No. 1 north of the switch.

The facts will be more particularly stated in connection with the questions raised by the defendant.

The principal grounds on which the defendant asks for a reversal are, first, that the defendant was not guilty of negligence; second, that Faulkner, the deceased, was negligent and that his negligence was the sole proximate cause of his death; and, third, that the weight of the evidence is against the verdict.

The specific acts of negligence of the defendant on which counsel for the plaintiff relies are that the defendant's engineer did not keep a proper lookout, did not give proper warning by ringing the bell or blow-

ing the whistle, and did not run at the proper rate of speed.

In arguing the contention that the defendant was not guilty of negligence, counsel for the defendant maintain "that the present accident was the result of one of the ordinary risks of the deceased's employment, within his knowledge and contemplation when the service began." Counsel for the defendant further explicitly contend "that deceased at the time he was injured had, as a matter of law, assumed the risks of his employment, and that in consequence thereof the questions as to whether a lookout was kept, whether the bell was ringing or a warning given, or whether a reduced rate of speed was maintained, were immaterial to the issues between the parties." The contention of counsel for the defendant would require us to hold, as a matter of law, that the deceased assumed as ordinary risks of his employment that no lookout would be kept, no bell would be rung or warning given, and that the speed would not be reduced. In our opinion the contention of counsel for the defendant is not correct. We cannot assume that the things which counsel for the defendant enumerate as ordinary risks are, as a matter of law, ordinary risks. The evidence relating to those questions is not undisputed, and the conclusions to be drawn from the evidence may be reasonably different. Those questions are, therefore, questions of fact for the jury. *Sturm v. Consolidated Coal Co.*, 248 Ill. 20, 27, 28; *Indiana, I. & I. R. Co. v. Otstot*, 212 Ill. 429, 434.

Under the Federal Employers' Liability Act the fellow-servant doctrine is not available as a defense. *Devine v. Chicago, R. I. & P. Ry. Co.*, 266 Ill. 248, 253; *DeBaur v. Lehigh Valley R. Co.*, 269 Fed. 964, 966.

The Federal Employers' Liability Act places a co-employee's negligence, when it is the ground of the action, in the same relation as that of the employer at common law to his employee in regard to the assumption of risk by the employee. That relation at

common law requires the employer to use reasonable care for the protection of his employees. *Himrod Coal Co. v. Clark,* 197 Ill. 514, 516; *Bonato v. Peabody Coal Co.,* 248 Ill. 422, 425. It has been expressly held under the Federal Employers' Liability Act that the employer owes to his employee the duty of exercising ordinary care for his employee's safety. *DeBaur v. Lehigh Valley R. Co., supra; Reed v. Director General of Railroads,* 258 U. S. 92, 95.

The act permits a recovery for a death resulting in whole or in part from the negligence of an employer's officers, agents or employees. *DeBaur v. Lehigh Valley R. Co., supra.*

At common law the employee assumed not only the ordinary risks incident to his employment, but also all dangers which are obvious and apparent. *McCormick Harvesting Machine Co. v. Zakzewski,* 220 Ill. 522, 530; *Bonato v. Peabody Coal Co., supra.* But he did not assume, as one of the ordinary risks, the non-compliance of the employer with the employer's duty to provide a reasonably safe place for the employee to work. *Bonato v. Peabody Coal Co., supra.* It is the rule that "An employee does not assume all the risks incident to his employment, but only to such as are usual, ordinary, and remain so incident after the master has taken reasonable care to prevent or remove them, or if extraordinary, such as are so obvious and expose him to danger so imminent that an ordinarily prudent and careful man would anticipate injury as so probable that in view of it he would not enter upon or remain in the employment." *Chicago & A. R. Co. v. House,* 172 Ill. 601, 605.

It is also the rule that "A servant does not assume the risk of a negligent manner of doing work by other servants, who are not fellow-servants, unless it is customary to do the work in that manner" (*Chicago & E. I. R. Co. v. White,* 209 Ill. 124, 132; *Gathman v. City of Chicago,* 236 Ill. 9, 17); and unless the servant has knowledge of the habitual or customary negligence of

such other servant. *Hartley v. Chicago & A. R. Co.,* 197 Ill. 440, 445, 446.

On the principles deducible from the foregoing authorities, the question whether the defendant was guilty of negligence in the case at bar was a question of fact for the jury. It was for the jury to determine from the evidence whether the defendant did not keep a lookout, did not ring a bell or give warning, and did not reduce the speed of the engine; and whether, if the defendant failed to do all or any of those things, the defendant was guilty of negligence.

Ross, who was a switchman working with Faulkner, the deceased, testified in behalf of plaintiff, in substance, that Faulkner was riding on the footboard of the switch engine, and that he, Ross, was on the front end of the head car, close enough to Faulkner "to have reached over and touched him"; that Faulkner got off the switch engine at a point just south of the switch; that he, Ross, got off the car about 20 or 30 feet ahead of Faulkner; that Faulkner walked over to track No. 2; that he, Ross, did not get on track No. 2, but that he was in the middle of the track between tracks No. 1 and No. 2; that the first he knew that the passenger engine was coming was when the whistle blew; that the passenger engine was about five car lengths ("pretty close" to 180 to 200 feet) north of Faulkner at the time it blew its whistle; that when the whistle blew, Faulkner looked toward it; that when he, Ross, heard the whistle blow he stepped further toward track No. 1; that Faulkner started to get off the track twice; that he started to get off quickly when he started; that he went east—started a little bit on an angle southeast; that he started to take the third step when he was hit; that when he was struck he was about at the east rail of track No. 2; that the engine hit his back and threw his head back; that the engine went right on; that after the engine had passed he, Ross, found the upper part of Faulkner's body about 15 or 20 feet south of the viaduct

352 APPELLATE COURTS OF ILLINOIS.

Faulkner v. New York Central Railroad Co., 232 Ill. App. 346.

in between the tracks; that the lower half of the body was about the center of the viaduct, east of the east rail; that he, Ross, did not hear any bell ring on the engine; that the engine was going thirty miles an hour; that there was no obstruction between Faulkner and the engine. Ross further testified that it was his job to throw the switch; that when Faulkner got off, he, Faulkner, had other work to do out there; that Faulkner did not have any work that he, Ross, knew of, which would take Faulkner onto track No. 2; that the switch engine was going four miles an hour; that when he, Ross, jumped off the car the momentum of the train would not make it necessary for him to go over on track No. 2; that he, Ross, could have stopped after taking one step; that sometimes in the work of switching, men are required to get as far away from the train as the adjoining track; that in getting off the car a man cannot step off an inch but he has to take a couple of steps.

Wilcox, the conductor of the crew in which Faulkner worked the day he was killed, testified in behalf of the plaintiff substantially that Faulkner followed the engine, and Ross did what was called working in the field; that Faulkner and Ross were in his crew for the first time that day; that he, Wilcox, was on track No. 1, twelve or fifteen car lengths north of the accident; that his view was obstructed; that he heard the passenger engine go by; that it did not stop at all; that his train was going about four or five miles an hour at the time Faulkner was hit. Wilcox further testified that he could not state exactly the speed at which the passenger engine which struck Faulkner was going, because he was on the opposite side of the cars.

Counsel for the plaintiff calls attention to the fact that the witness Wilcox admitted that he testified at the coroner's inquest that the passenger engine was "going along" at a "pretty good gait" or a "pretty fast gait." This admission alone, however, would not

make the witness' testimony at the coroner's inquest independent substantive evidence. *Illinois Cent. R. Co. v. Wade,* 206 Ill. 523, 530; *Chicago City Ry. Co. v. Matthieson,* 212 Ill. 292, 296; *Ritter v. People,* 130 Ill. 255, 260; 2 Wigmore on Evidence (1st ed.) sec. 1018, p. 1719. Although the admission involved the witness in a self-contradiction (2 Wigmore on Evidence, sec. 1023, p. 1189) the testimony at the coroner's inquest was not adopted by the witness as his testimony at the trial, and cannot, therefore, be considered as his testimony at the trial.

Wilcox also testified for the defendant. He stated that no engine did switching besides his; that there was no work or duty which required Faulkner to go onto track No. 2, where he was hurt; that all that was necessary for him to do was to get off his train there; that there were no obstructions on track No. 1 that would prevent Faulkner from seeing the approach of the passenger engine.

Davis, the fireman on the engine that struck Faulkner, testified in behalf of the defendant that he did not see the accident; that he was told after he got to the yards that Faulkner had been killed; that the engine was backing down to the Englewood road house; that the bell was ringing; that there was an automatic bell ringer; that the bell won't ring unless you turn it; that a couple of short blasts of the whistle were sounded at 53rd street; that the engineer did not stop the engine as he approached 53rd street at the time the whistle blew; that as the engine approached 53rd street, in order "for me to see a man ahead of me on the track" the man would have to be 100 feet ahead of the tender of the engine; that he was looking out of the window of the engine; that he always has his head out of the window; that the engine was going at the rate of ten to twelve miles an hour all the way; that that was the customary speed over that track.

Grippen, the fireman on the switch engine in connec-

tion with which Faulkner was working, testified in behalf of the defendant that he did not see Faulkner hit; that he saw the engine that struck Faulkner as it went by him, Grippen; that he judged the speed to be between fifteen and eighteen miles an hour.

Gutekanst, the engineer of the switch engine, testified in behalf of the defendant that the first that he knew of the accident was when he heard four or five short blasts of the whistle and heard his fireman say, "They got our head man."

Moore, the engineer of the engine that struck Faulkner, testified in behalf of the defendant, in substance, that the first he knew that his engine had struck Faulkner and killed him was when he reached Englewood and was told of the accident; that he was backing to Englewood; that the tender was ahead of him; that as he approached 53rd street his bell was ringing; that it was an automatic bell, a bell that rings by air; that it is started with a cock which is in the cab of the engine and which turns on the air; that as he approached 53rd street he saw "a man" possibly about 120 or 130 feet from the viaduct; that the man "fouled" track No. 2; that he blew his whistle at him and he jumped off; that when he last saw him he had cleared the track; that when he saw him, he, Moore, was about 120 or 130 feet from the viaduct and the man was about 60 feet from the viaduct; that he, Moore, could see a man ahead of his tender on the track if the man was 60 or 70 feet ahead; that the tender is about 27 feet long; that the top of the tender is about 3 feet higher than the seat in the cab; that as he sat in his cab on the morning of the accident, as he approached 53rd street, he could not see over the top of the tender; that you have to look out on the side, and that the width of the tender is about 11 feet 2 inches; that whatever the width is and whatever the height is, as we approach a man on the track, our view is shut off within about 60 feet of that man by the tender; that some mornings men were

Faulkner v. New York Central Railroad Co., 232 Ill. App. 346.

working at the switch and some mornings they were not; that it was a cold, freezing day, a little bit cloudy, but it was not dark, and there was nothing to prevent him Moore· from seeing; that he kept his head out of the cab window all the way down from La Salle street, and that the window was open all the way; that he kept his head out of the window all the time from the 43rd street yard down; that he sat with his head out of the window and his hand on the throttle; that it was the work of an instant to blow the whistle or shut off the steam and apply the air; that as he went along there towards 53rd street before he saw "this man" at all, he was prepared to stop any time; that he did not know that there was switching at 53rd street as he went down there; that he saw a string of cars on the track back of track No. 1; that he does not remember any cars being on track No. 1; that they might have been back aways, but there was none up close; that the switch engine had already straightened out on track No. 1 before "this man" got off; that he knew that they were switching there; that he knew that the switch was where the tracks join, close to the bridge; that he knew that somebody would have to get off of that train to throw that switch at some time; that he knew that the place that they would get off would be at the switch, one side of the train or the other; that he did not know which side of the train they would get off; that he saw only one man; that another man might have come up from the other side, but that he does not remember the other man; that he started from Root street and went to Englewood at about twelve miles an hour; that there was a brake on every wheel on the engine and all controlled by air; that in addition to the application of the brakes he could reverse his engine, which is an aid in making a quick stop; that there is a little window in the back of the cab; that he could sit on his seat and see through that window off to the side of the tender; that if the tracks are 8 feet apart he could look

through that little window, which is immediately south of him, and see quite a ways back—several hundred feet down between the tracks—without sticking his head out at all; that he cannot see anybody if he is closer than 60 feet from the end of the tender, but that he could see him if he was a distance beyond that; that he was about 120 or 130 feet from the viaduct when he first noticed the switch engine; that "the man" he saw jump off the train jumped off of the second or third car; he is not positive which car it was; that he did not see the man before the man jumped off; that when the man jumped off he crossed over the space, which is about 8 feet, to track No. 2; that the man jumped off of track No. 2 and ran toward track No. 1, when he, the engineer, blew his whistle; that the man was looking toward the engine and raised his head as he looked at the engine, when the engine was passing him; that when the man was on the track, he, the engineer, "shut off," blew the whistle and applied the brakes; that just as soon as the man cleared the track he, the engineer, put on steam again and released the brakes; that he did not slow down very much from ten to twelve miles an hour; that it is customary to have your head out of the window at all times in the yard when you are backing out.

On cross-examination Moore was examined as follows:

"Q. As a railroad man of years' experience you speak of, do you or do you not know it is necessary to the reasonable safety of switchmen switching cars on adjoining tracks for an engine not to run past them at a rate of speed higher than ten or twelve miles an hour? A. Well, I said I was running twelve miles an hour.

"Q. Yes, and that is because you thought that that was the reasonably safe thing to do, isn't that right? A. That is what I claim is right. Safety.

"Q. In other words, safety required it? A. Yes."

The testimony of Moore is inherently improbable,

According to Moore's testimony he knew that switching was going on and knew where the switch was located. Moore also knew that somebody would have to get off of one side or the other of the train which the switch engine was pulling to throw the switch. Moore further knew that safety required a speed of twelve miles an hour, and that that speed was the customary rate of speed. In other words, Moore was fully aware that the situation demanded the exercise of care—at least the ordinary care usual in the circumstances. Did Moore exercise such care? Moore stated that he sat just back of the boiler head with his head out of the window of his cab and with his right hand on the throttle; that it was the work of an instant to blow the whistle, shut off the steam and apply the air; that he had his head out of the window of the cab all the way from LaSalle street station; that he kept it out of the window all the time from 43rd street yard. Apparently Moore was ready and alert for any emergency. He was 120 or 130 feet from the viaduct when he saw "a man" on track No. 2, and blew his whistle. Faulkner was at or near the viaduct at the time, and either on track No. 2 or walking towards it. Yet Moore failed to see Faulkner although the view on the track was unobstructed for a little over a mile, and Moore testified that there was nothing to prevent him from seeing Faulkner. If Moore was keeping the lookout that he says he was, it is difficult to understand why he did not see Faulkner. If Moore had seen him; if the engine was going twelve miles an hour, as Moore says it was; if Moore had had his hand on the throttle, prepared to stop at any time, as he so testified, the speed of the engine could probably have been reduced sufficiently within the 120 or 130 feet to prevent the accident. From Moore's inherently improbable and inconsistent testimony the jury reasonably might have inferred that he did not keep the lookout and exercise the care that he says he did. *Podolski v. Stone*, 186 Ill. 540, 548. When

Moore's testimony as to the rate of speed of his engine in considered in connection with Ross' testimony that the engine was going thirty miles an hour, and with Grippen's testimony that it was going between fifteen and eighteen miles an hour, the jury would have been justified in inferring that the engine was going at a rate of speed in excess of the customary rate of twelve miles an hour.

We do not think that an extended discussion of all of the evidence is necessary. The statement of facts, which we have set out at length, carries its own argument. In our opinion there is sufficient evidence to warrant the jury in finding that the defendant was negligent; that the negligence was not one of the ordinary risks assumed by the deceased, Faulkner, as an incident to his employment; and that the negligence was not habitual or customary negligence obviously or fully known and appreciated by the deceased.

Counsel for the defendant contend that Faulkner, the deceased, was negligent and that his negligence was the sole proximate cause of his death. Under the Employers' Liability Act, even though the plaintiff's negligence contributed with the defendant's negligence to cause the injury, the plaintiff's right of action would not be defeated. The plaintiff's negligence may only be considered in mitigation of damages. "It is only when plaintiff's act is the sole cause—when defendant's act is no part of the causation—that defendant is free from liability under this act." *Grand Trunk Western Ry. Co. v. Lindsay,* 233 U. S. 42, 47.

In our opinion the evidence does not show, as a matter of law, that the negligence, if any, of Faulkner, the deceased, was the sole proximate cause of the accident. The question was one of fact for the jury, which the jury decided adversely to the defendant. We think that there is evidence sufficient to support the finding.

From a consideration of all of the evidence we are of the opinion that the verdict of the jury finding the defendant guilty of negligence was not manifestly

against the weight of the evidence. The evidence was conflicting on material issues, and the rule is a familiar one that a verdict will not be set aside where "there is a contrariety of evidence" and the facts and circumstances "by a fair and reasonable intendment" will authorize the verdict. *Carney v. Sheedy,* 295 Ill. 78, 83; *Bradley v. Palmer,* 193 Ill. 15, 89; *Illinois Cent. R. Co. v. Gillis,* 68 Ill. 317, 319.

For the reasons stated the judgment of the trial court is affirmed.

*Affirmed.*

MATCHETT, P. J., and McSURELY, J., concur.